STATE of Alaska, Appellant,

v.

A. J. INDUSTRIES, INC., Appellee.

No. 477.

Supreme Court of Alaska.

Dec. 9, 1964.

George N. Hayes, Atty. Gen., and John K. Brubaker, Asst. Atty. Gen., Juneau, for appellant.

Herbert L. Faulkner, Roger G. Connor and Allan A. Engstrom, Juneau, for appellee.

Before NESBETT, C. J., AREND, J., and MOODY, Superior Court Judge.

NESBETT, Chief Justice.

The question to be decided is whether the appellee is entitled to a preference right from the State of Alaska to obtain title to approximately 98.76 acres of real property located in Gastineau Channel near Juneau, Alaska. The property was created over a period of twenty-five years by the dumping of rock and tailings on the tidal and submerged lands of the channel, the rock and tailings being produced by appellee's nearby mining operation.

From 1914 until the declining price of gold forced a closure of the mine in 1944, appellee and its predecessor engaged in a hard rock gold mining operation on and in a mountain which rises steeply from the shoreline of Gastineau Channel adjacent to the land in question.

The low gold content of the ore required an operation of great magnitude. It therefore became necessary to find a means of disposing of as much as thirteen thousand tons per day of crushed rock and mill tailings. Disposal was accomplished over the years by dumping the rock and tailings on the tidelands adjacent to the mining property. After the tidelands had been filled, the rock disposal was then dumped onto the submerged lands under Gastineau Channel where the water depth ranged from 140 feet upward. Tide and submerged land dumping was done under the authority of permits from the War Department which supervised the disposal to some extent and renewed the permits from time to time. In time a considerable acreage of real property was created well above high water which came to be in some demand for industrial uses.

Since the decision in this case will be determined to a large extent by the uses made of the property after its creation, we shall recount the facts pertaining to usage in some detail.

In 1937 appellee leased portions of the property to Union Oil Company for docking purposes and a tank farm. Another portion of the area was leased to radio station KINY in 1948. During World War II approximately twelve acres were leased to the Corps of Army Engineers for ten dollars per acre per year. Between 1946 and 1951 an Alaska Coastal Airlines beam station occupied a portion of the property under lease. In 1947 part of the area was leased by appellee to the Juneau Spruce Corporation for storage and shipping purposes. From time to time portions of the premises were leased to persons who worked the tailings to reclaim gold on a royalty basis. In 1948 warehouses which were left on the property by the Army Engineers were leased to a construction company. The warehouses and surrounding area were later leased by appellee to Juneau Motors for the storage of automobiles. Another part of the area was rented by the Lemon Creek Sand & Gravel Company as a storage area. Appellee had regularly used a portion of the property for the storage of mining and electrical distribution equipment. On occasion, rock and sand from the fill were sold. Another portion was leased for boat storage and a boat ramp. Still another portion was leased to Southeastern Salvage Company for the loading and unloading of barges at a barge ramp. Many of the above uses, which are the subject of this appeal, were still in effect as of the date of the hearing.

Alaska attained statehood on January 3, 1959. Section 6(m) of the Alaska State-

hood Act [1] provided that the Submerged Lands Act of 1953 [2] should be applicable to Alaska, which meant that Alaska was given the same ownership of tidelands and lands beneath navigable waters as other states of the Union.[3]

During the first session of the Alaska Legislature it was officially declared to be the policy of the state to allow preference rights for the acquisition of tidelands and submerged lands to those who occupied or developed for municipal business, residential or other beneficial purposes on or before the date of admission of Alaska into the Union. AS 38.05.320(a) states:

"It is the policy of the state to allow preference rights for the acquisition of tidelands and submerged lands occupied or developed for municipal business, residential or other beneficial purposes on or before the date of admission of Alaska into the Union. Nothing in this section vests the right in a person to acquire the lands until a conveyance from the state is delivered to the grantee."

The legislation which declared this policy established several classes of preference rights. Appellee applied for a Class I preference right under AS 38.05.320(c) which states:

"An occupant of tide or submerged land which is not seaward of a municipal corporation, who *occupied or developed* it on and prior to September 7, 1957, has a class I preference right to the lands from the state. * * *"
(Emphasis supplied.)

AS 38.05.320(d) (5) defines this right as follows:

" 'class I preference right' means the right of an occupant to acquire tidelands and submerged lands for a consideration not exceeding the costs of surveying, transferring and conveying the title to it."

"Occupant" is defined in AS 38.05.320(d)(1) as follows:

"(d) For the purposes of this section unless the context otherwise requires

"(1) 'occupant' means a person or his successor in interest, who actually occupied for business, residential or other beneficial purpose, tidelands, or tidelands and submerged lands contiguous to tidelands, in the state, on and before January 3, 1959, with substantial permanent improvements. The holder of a permit or clearance in respect to interference of navigation, or of a special use permit from a government agency does not qualify as an 'occupant' unless entry on the land had, through exercise of reasonable diligence, resulted in occupancy and substantial permanent improvements; no person is an occupant by reason of having (A) placed a fish trap in position for operation or upon the tide or submerged land for storage, (B) placed a set net or piling for a set net, or any other device or facility for taking fish, (C) placed pilings or dolphins for log storage or other moorage, (D) placed floats or vessels upon the tide or submerged land, (E) placed telephone, power or other transmission facilities, roads, trails or other improvements not requiring exclusive use or possession of tide or submerged lands, or (F) claimed the land by virtue of some form of constructive occupancy; where land is occupied by a person other than the owner of the improvements on it, the owner of the improvements is, for the purposes of this section, the occupant of the lands."

Lastly, the phrase "occupied or developed" is defined by AS 38.05.320(d) (4) as follows:

" 'occupied or developed' means the use, occupancy and control of tidelands or

1. 72 Stat. 339 (1958), 48 U.S.C.A. p. 8 (Supp.1963).
2. 67 Stat. 29 (1953), 43 U.S.C.A. § 1301 (1964).
3. 67 Stat. 30 (1953), 43 U.S.C.A. § 1311 (a) (1964).

submerged land by the establishment on it of substantial permanent improvements other than those uses, facilities and improvements not qualifying a person to be an occupant."

Since an occupant of the tide and submerged lands for which he is seeking a preference right must have improved the land, Section 120.214 of the Alaska Administrative Code[4] becomes pertinent. This section states:

" 'Improvements' shall mean buildings, wharfs, piers, dry docks, and other similar types of structures permanently fixed to the tide or contiguous submerged lands that were constructed and/or maintained by the applicant for business, commercial, recreation, residential, or other beneficial uses or purposes. In no event shall fill be considered a permanent improvement when placed on the tidelands solely for the purposes of disposing of waste or spoils. However, fill material actually utilized for beneficial purposes by the applicant shall be considered a permanent improvement."

Since fill can, under certain circumstances, be an improvement, we must also be concerned with Section 120.215 of the Alaska Administrative Code, which states:

" 'Fill' shall mean earth, gravel, rock, sand, or other similar materials placed upon tide or contiguous submerged lands for the purpose of elevating the lands for a specific useful purpose. The placement of earth, gravel, rock, sand, or other similar materials on tide or contiguous submerged land solely for the purpose of spoils disposal and thereafter abandoned and not used for any beneficial purpose shall not be considered fill."

An informal hearing was held before the State Director of the Division of Lands on appellee's application for a Class I preference right. Considerable testimony was heard and we have as a part of the record for our assistance in determining the case a complete transcript of this testimony.

The decision of the Director was that the area of fill occupied by the rock dump proper was a substantial permanent improvement that had been beneficially used. However, the Director found that that area of fill created by the dumping of fine mine tailings was not a permanent improvement, pointing out that the very nature of the tailings caused them to become migratory in normal wave and current action. The decision further pointed out that appellee had taken no precautions to prevent migration from occurring and that this had actually happened to a considerable extent.[5]

Appellant appealed the decision of the Director of the Division of Lands to the Commissioner of Natural Resources where it was affirmed. Appellant then appealed to the Superior Court where the decision of the Commissioner was affirmed.

Appellant contends that the rock fill, in and of itself, does not qualify as a substantial permanent improvement and that the various uses of the rock fill made by appellee cannot be considered as beneficial purposes so as to convert the fill into a permanent improvement within the meaning of Section 120.214 of the Alaska Administrative Code.[6]

Appellant argues that the phrase "occupied or developed" appearing in AS 38.05.320(a) and defined in AS 38.05.320(d)(4)[7] restricts preference rights to persons

---

4. 11 Alaska Adm.Code §§ 120–124.601 (1962).

5. The decision of the Director rejected the following area of ATS 201:
"The area rejected shall include that area of ATS 201 that is situated southeast of a line drawn from Cor. 24 of ATS 201 to a point on a line between

Cor. 32 and Cor. 31 and said point being located approximately 200 feet southeast of Corner No. 32. The position of the above line and the location of the rejected area is shown on ATS 201 which is hereby made a part of this decision."

6. Supra note 4.

7. Quoted on page 282 supra.

who actually occupied, used and controlled the lands by the establishment of substantial permanent improvements prior to and on September 7, 1957. It is argued that "establishment" means to "bring into being", "to build", "to create" substantial permanent improvements. Further, since Section 120.214 of the Alaska Administrative Code provides that the permanent improvements provided for therein may have been "constructed and/or maintained by the applicant" and that insofar as this administrative regulation attempts to provide that the "maintenance" of permanent improvements placed on the tidelands by persons other than the applicant can create a Class I preference right, it is void for being in direct conflict with the express language of the statute, to the extent that it so conflicts.

In essence, appellant's contention is that the applicant himself must have established substantial permanent improvements on the lands, and must himself have actually used, occupied and controlled the land for beneficial purposes prior to and on September 7, 1957.

Pertinent to the consideration of appellant's argument at this point is AS 38.05.320 (d) (1) (F), which provides in part:

"* * * no person is an occupant by reason of having * * * (F) claimed the land by virtue of some form of constructive occupancy; where land is occupied by a person other than the owner of the improvements on it, the owner of the improvements is, for the purposes of this section, the occupant of the lands."

Our interpretation of the relationship of the above provisions is that the language following the semicolon creates an exception to the restriction of (F) immediately preceding it.

In an attempt to interpret and apply the various statutes and regulations involved, we shall commence with Section 120.215 [8] of the Alaska Administrative Code which defines "fill". It is quite apparent that the rock and tailings in the case before us could not qualify as "fill" under the first sentence of this section because they were not placed upon the tide and submerged lands " * * for the purpose of elevating the lands for a specific useful purpose." The testimony was that the rock and tailings were dumped as and where they were as a matter of convenience and because there was no other place. It is also apparent from the second sentence of this section that if the rock and tailings, after being placed on the lands, had been " * * * thereafter abandoned and not used for any beneficial purpose * * *" that they could not be considered as fill. On the other hand, it seems plain enough that although the rock fill in this case was not placed for the purpose of elevating the land for a specific useful purpose and that the dumping was done primarily if not solely for purposes of disposal, that the resulting fill may, nevertheless, qualify as fill if it was not abandoned and was used for "any beneficial purpose". Since it is conceded that the area of land created by the rock and tailings was not abandoned and appellee contends that the area was used for a "beneficial purpose", it becomes necessary to inquire further.

This brings us to a consideration of Section 120.214 of the Alaska Administrative Code [9] which defines "improvements" to a limited extent and states the condition under which fill may be considered to be a permanent improvement. It is clear from the last two sentences of this section that fill which is "actually utilized for beneficial purposes" shall be considered a permanent improvement. Appellant argues that since the last sentence of this section states that "fill material" actually utilized for beneficial purposes shall be considered a permanent improvement, that "fill material" must be construed to mean the component parts of the fill such as rock, mine tailings, earth, etc. In other words, that for the rock fill to

8. 11 Alaska Adm.Code § 120.215 (1962), set out on page 283 supra.

9. 11 Alaska Adm.Code § 120.214 (1962), set out on page 283 supra.

qualify in any fashion as a "permanent improvement" under this section, beneficial use must have been made of some or all of the component parts of the fill.

The use of the phrase "fill material" in the last sentence of section 120.214, where only the word "fill" was used elsewhere in this and in a succeeding section lends only minor support to appellant's argument. If the proposed interpretation were applied it would require a holding that the only way the rock fill could qualify as a permanent improvement would be by a showing of actual use of some or all of the particular component parts of the rock fill for some beneficial purpose.

Such a use would necessarily require the removal of the fill components from repose in the aggregate of the rock fill to be applied to the use. This would destroy the fill to the extent of such use. The sentence under consideration purports to state when fill material can become a "permanent improvement". Removal of the component parts of the rock fill is inconsistent with the basic concept of the sentence which is that the "fill material" can be "permanent" and an "improvement".

The first sentence of section 120.214 defines "improvements" as "buildings, wharfs, piers, dry docks, and other similar types of structures permanently fixed to the tide or contiguous submerged lands that were constucted and/or maintained by the applicant for business, commercial, recreation, residential, or other beneficial uses or purposes". In attempting to apply this sentence to the facts of the case we realize at once that by the very nature of the fill in Gastineau Channel it would not be feasible to construct "buildings, wharfs, piers, dry docks and other similar types of structures permanently fixed to the tide or contiguous submerged lands" for the reason that the fill made by appellee actually converted the tide and submerged lands into ordinary real property located above high water mark.[10]

Since none of the specific improvements mentioned in the regulation would be feasible on this type rock fill, we shall direct our consideration towards determining whether the uses made by appellee amounted to "other beneficial uses or purposes".

*Rentals to Union Oil and Radio Station KINY*

Appellant argues that under the provisions of AS 38.05.320 appellee must itself have used, occupied and controlled the tide and submerged land for business or other beneficial purposes and that the use, occupancy and control of Union Oil and KINY of the particular portion of the rock fill occupied by them is not the use, occupancy and control of appellee.

We are of the view that as to the areas leased by Union Oil and KINY appellee has satisfied the requirements of the statutes and regulations. It is conceded that appellee, by dumping rock and fill in the area performed basic development work which created land suitable, in fact desirable, for certain business uses. There is no contention that appellee ever evidenced an intent to abandon any portion of the premises, in fact the evidence is that appellee at all times exercised control over the area. After creating the land, appellee then leased portions to Union and KINY who erected whatever buildings and structures were necessary for their particular business uses. The uses made of their leaseholds by Union and KINY were beneficial to them and to the public. The beneficial uses made by the lessees accrued to the benefit of appellee in its application for a preference by reason of that portion of AS 38.05.320(d) (1) following (F) [11] which provides that occupancy of the land by one other than the owner of the improvements is the occupancy of the owner.

Appellant argues that appellee did not and still does not own the improvements consisting of tanks, radio towers, etc., which

10. The Director found from the evidence that the rock fill was built up in some areas to an elevation of one hundred feet.

11. Set out on pages 282 and 284 supra.

belong to lessees. The answer is that under the particular facts of this case, the rock fill itself, by reason of its suitability and utilization for a business use and the procurement of such a use by appellee, became a permanent improvement owned by appellee to the extent that it could be owned within the meaning of the statute.

### Sale of Fill Material

Appellant next argues that the sale of fill material from the rock fill does not qualify that portion of the rock fill as a substantial improvement.

The testimony established that over the years considerable quantities of the fill were sold for building construction purposes, airport construction, street sanding and other uses. Appellant now argues that such use of the fill tended to destroy it rather than enhance it from the status of mere "fill" to that of a "permanent improvement".

■ The most reasonable construction to be placed on this evidence would seem to be that the business of supplying mine disposal materials for sale for construction purposes was carried on by appellee on the rock fill. Until the mine closed in 1944 thousands of tons per day of disposal passed over the rock fill. Whether the major portion of the materials sold had been dumped and had acquired the status of "fill" or were mine disposal stockpiled on the fill for later sale is not clear from the evidence. It is not contended that enough actual "fill" was sold from any given area to destroy that portion of the fill. Under the circumstances and since the materials were used for construction purposes, we hold that to the extent that it was used for the sale of fill materials the rock fill was being put to a beneficial use.

### Open Storage

Appellant argues that the open storage of materials on the rock fill does not constitute use and occupancy of the area with the establishment of substantial permanent improvements.

The evidence was that appellee, in connection with its mining operations and its electrical distribution business, made a considerable use of portions of the area for the open storage of machinery and poles. Several of the lessees made a similar use of portions of the area for the open storage of materials and equipment related to their business activities.

■ The evidence of open storage does not establish the existence of a permanent improvement, but we agree with the Commissioner who found that it did establish a beneficial use, directly related to the business activities of appellee and its lessees, and to this extent accrued to the benefit of appellee in determining whether it was entitled to a preference right.

### Use and Maintenance of Barge Stall

We next consider appellant's claim that sporadic use and maintenance of a barge stall or ramp constructed by the Corps of Army Engineers cannot accrue to appellee's benefit in acquiring a preference right because appellee itself did not "establish" the improvement.

It appears from the evidence that the Corps of Engineers leased a portion of the area under consideration from appellee for a nominal rental. The Corps' occupancy extended through World War II and until approximately 1948. During its occupancy the Corps constructed a barge ramp on the property in question and a storage shed. Both were abandoned when the Corps terminated its lumber activities in the area.

Since the departure of the Army, appellee had used the barge ramp from time to time, had leased it on occasion and had kept it in repair. Appellee took possession of the storage shed and had, since the departure of the Army, leased the shed to Juneau Motors for indoor storage purposes.

■ In our view the barge stall was an improvement as similar to "wharfs, piers, dry docks" listed in section 120.214 as

could have been constructed on the fill, considering that it had been built up to such a height that it no longer constituted tide or submerged land. Appellant's criticism that the use of the barge ramp was sporadic cannot be controlling since it would appear that the demand for such a facility in the existing state of the economy of the area did not justify any greater use. The testimony was that appellee did in fact maintain the ramp. We conclude therefore that the installation, its use and its maintenance were all factors that accrued to appellee's benefit for the purpose of determining whether it was entitled to preference rights. We hold that the shed, abandoned by the Army when it terminated its activities, and taken over by appellee constituted a permanent improvement which, although not established or constructed by appellee, was under its control and being put to a beneficial use by appellee's lessee.

■ Appellant argues that the phrase "and/or maintained" in section 120.214 is part of an interpretative regulation which is in conflict with that portion of AS 38.05.-320(d) (4) requiring that the improvement be "established". We do not so construe it. Its use would appear to supply an alternative to "constructed", to provide for the situation where applicant may not have actually constructed the improvement but had nevertheless caused the improvement to be on the land for a beneficial use or purpose.

*Trestle and Conveyor System*

Lastly, we consider appellant's claim that the conveyor system on the rock fill did not constitute a substantial improvement and that the trestle did not qualify appellee as an occupant of the rock fill.

The testimony shows that the trestle and conveyor system was expanded as necessary over the years to meet the disposal requirements of appellee's mine. It was intended and constructed for the sole purpose of conveying disposal across the already created fill to the channel for dumping into the channel or into a barge for removal to deeper water for dumping. Although the major use for the conveyor, trestle and flumes ceased when the mining ceased in 1944, there was testimony that the trestle and conveyor had been used in approximately 1956 to transport scrap iron to the barge ramp for lightering to an ocean-going vessel. Both facilities were in a state of disrepair as of 1957, but could have been put in use with small repairs. There was testimony that the mine was being maintained in a reasonable state of readiness so that it could have been reopened if the price of gold had been increased sufficiently. It was conceded that the facilities were substantial permanent improvements at one time, but disputed that they could be considered such as of September 7, 1957.

■ We believe that under these facts what were concededly substantial permanent improvements when constructed, remained such and that it was proper to consider them in appellee's favor as of September 7, 1957. The trestle could properly be considered in appellee's favor in determining whether it was an occupant of the rock fill.

■ We agree with the Director that appellee was not required to show that every square foot of the rock fill was occupied in order to show that the particular area being considered was being put to a beneficial use. We also agree with his finding, which was affirmed by the Commissioner of Natural Resources and the Superior Court, that the rock fill proper in this case was a substantial permanent improvement that had been beneficially used.

The judgment is affirmed.