**Michael HAYES, Howard Hayes, and Taku Mining Company, Appellants,**

v.

**ALASKA JUNEAU FOREST INDUSTRIES, INC.; Charles Schneider and Rudy Belardi, members in joint venture, d/b/a Taku Mining Company, Appellees.**

No. S–1834.

Supreme Court of Alaska.

Jan. 8, 1988.

Rehearing Denied Jan. 28, 1988.

---

Mark A. Sandberg, Camarot, Sandberg & Smith, Anchorage, for appellants.

James N. Reeves and Blythe W. Marston, Bogle & Gates, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON, and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

The question presented in this case is whether the State of Alaska or the appellee, Alaska Juneau Forest Industries, Inc., owns the minerals contained in the tailings which cover certain tidal and submerged lands known as Alaska Tidal Survey No. 201 (the property). We hold that the minerals are owned by the state.

This is the second case involving this property. In *State v. A.J. Industries*, 397 P.2d 280 (Alaska 1964), we held that A.J. Industries, Inc.[1] was entitled to a preference right to obtain title to the property from the State of Alaska. We set out the facts concerning deposit of the tailings as follows:

The property was created over a period of twenty-five years by the dumping of rock and tailings on the tidal and submerged lands of the channel, the rock and tailings being produced by [A.J.'s] nearby mining operations.

From 1914 until the declining price of gold forced a closure of the mine in 1944, [A.J.] and its predecessor engaged in a hard rock gold mining operation on and in a mountain which rises steeply from the shoreline of Gastineau Channel adjacent to the land in question.

The low gold content of the ore required an operation of great magnitude. It therefore became necessary to find a means of disposing of as much as thirteen thousand tons per day of crushed rock and mill tailings. Disposal was accomplished over the years by dumping the rock and tailings on the tidelands adjacent to the mining property. After the tidelands had been filed, the rock disposal was then dumped onto the submerged lands under Gastineau Channel where the water depth ranged from 140 feet upward. Tide and submerged land dumping was done under the authority of permits from the War Department which supervised the disposal to some extent and renewed the permits from time to time. In time a considerable acreage of real property was created well above high water which came to be in some demand for industrial uses.

*Id.* at 281.

A.J.'s use of the property was described as follows:

In 1937 [A.J.] leased portions of the property to Union Oil Company for docking purposes and tank farm. Another portion of the area was leased to radio station KINY in 1948. During World War II approximately twelve acres were leased to the Corps of Army Engineers for ten dollars per acre per year. Between 1946 and 1951 an Alaska Coastal Airlines beam station occupied a portion of the property under lease. In 1947 part of the area was leased by [A.J.] to

---

1. A.J. Industries, Inc. is the predecessor in title to the appellee, Alaska Juneau Forest Industries, Inc. For convenience, both will be referred to as A.J.

the Juneau Spruce Corporation for storage and shipping purposes. From time to time portions of the premises were leased to persons who worked the tailings to reclaim gold on a royalty basis. In 1948 warehouses which were left on the property by the Army Engineers were leased to a construction company. The warehouses and surrounding area were later leased by [A.J.] to Juneau Motors for the storage of automobiles. Another part of the area was rented by the Lemon Creek Sand and Gravel Company as a storage area. [A.J.] had regularly used a portion of the property for the storage of mining and electrical distribution equipment. On occasion, rock and sand from the fill were sold. Another portion was leased for boat storage and a boat ramp. Still another portion was leased to Southeastern Salvage Company for the loading and unloading of barges at a barge ramp.

*Id.* at 281.

Until statehood was achieved in 1959, the land encompassed in the survey was owned by the United States. At statehood title passed to the state under section 6(m) of the Alaska Statehood Act, Pub.L. No. 85–508, 72 Stat. 339 (1958) (set out in a note preceding 48 U.S.C. § 21 (1982)). The first state legislature enacted AS 38.05.320, which provided that certain users of tide or submerged lands had preference rights to purchase such lands from the state for a price not exceeding survey and transfer costs. As noted, we held that A.J. was entitled to such a right in *A.J. Industries.* Consequently, in 1967 the state issued a patent granting the property to A.J. However, the patent reserved to the state out of the grant, "all ... minerals ... of every name, kind or description, ... which may be in or upon said land...."

In 1981, the appellants (Hayes) and A.J. executed a mining lease under which Hayes was granted the right to mine gold on a portion of the property. After the lease expired Hayes continued to mine while negotiating for a new lease. When negotiations failed to produce an agreement, Hayes staked mining claims on the property, contending that the minerals were

owned by the state. A.J. filed this action for ejectment. Hayes counterclaimed seeking an adjudication that he had acquired mineral rights from the state by staking the property.

On cross-motions for partial summary judgment, the superior court held that "[t]he material situated on the original tide and submerged land known as Alaska Tideland Survey No. 201 did not pass to the State of Alaska under Section 6 of the Alaska Statehood Act. Title to that material was retained by A.J. Industries, Inc. whose interest is now held by the plaintiff." The court concluded that Hayes should be ejected from the property and dismissed its counterclaim with prejudice. This appeal followed.

Hayes' argument on appeal is that the tailings became a part of the real estate. If that were not so, A.J. could not have won the preference right litigation because unless the tailings were a "substantial permanent improvement" A.J. would not have been qualified for a preference right. Since the tailings were part of the real estate, they were owned by the United States and passed to the State of Alaska at statehood. The real estate was conveyed by the state to A.J. in the 1967 patent but the minerals contained therein were not.

A.J. argues that it never abandoned the tailings and that title to them never passed to the United States or the state. Thus, the mineral reservations clause in the 1967 patent does not apply to the minerals contained in the tailings. A.J. argued in the trial court that the tailings, because they were not abandoned, were personal property. This argument is made on appeal only by implication, that is, by citing numerous authorities which hold that tailings which are not abandoned are personalty. A.J. now argues expressly that the tailings are real estate, but that title to them did not pass to the owner of the lands on which they were deposited.

Abandonment of tailings is one way that tailings become real estate, but it is not the only way. When tailings are deposited for the purpose of disposal, as distinct from

being stockpiled for future use, they become real estate even though they are not abandoned. Further, when tailings are used as real estate they become real estate. The discussion which follows explains these points. We conclude that the tailings became real estate when they were disposed of and as such they were the property of the owner of the tide and submerged lands on which they were deposited.

Our opinion in *A.J. Industries* consistently refers to the tailings or "fill" as real property.[2] It also makes clear that "the area of land created by the rock and tailings was not abandoned." 397 P.2d at 284.[3]

 The concept of abandonment plays an important role in several cases involving tailings or other mine wastes. If the tailings are "abandoned" they become real estate, if they are not abandoned they remain the personal property of the mine or mill which created them.[4] One such case is *Ritter v. Lynch*, 123 F. 930 (C.C.D.Nev. 1903):

> If the tailings had been suffered by [the mine owner] to flow where they listed, his claim of ownership therein would have to be considered as abandoned; or if the tailings were, by their own uninterrupted flow, lodged upon the land of another, they would be considered as an accretion and belong to the owner of the land. If they were allowed to flow in their natural course, and accumulate on vacant and unappropriated public land, they would become subject to appropriation by any one who took them up and

pursued the steps and proceedings analogous to the location of placer mining claims.

*Id.* at 931.

*Conway v. Fabian,* 108 Mont. 287, 89 P.2d 1022 (1939), involved mill tailings which were impounded by cribbed enclosures constructed and maintained by the mill owner. Over time, some of the tailings were washed out of the enclosures and spread over the land beyond them. Plaintiffs, the successors to the mill owner, claimed that the tailings were personal property. The defendants claimed that they were real estate and thus part of the placer claims which they had staked. The court held that the impounded tailings were personal property and that the unimpounded tailings were real property. The question was first posed using terms of abandonment. *Id.* 89 P.2d at 1029. However, the court further stated, more generally, that the intention of the mill owner was dispositive:

> The intention with which the owner of the property extracted the ore from the ground and the purpose and intention of the owner with which it was placed on the dump is controlling in arriving at a solution of the question of whether the ore after having been extracted and placed in the dump was personalty or realty.

*Id.* (quoting *Steinfeld v. Omega Copper Co.,* 16 Ariz. 230, 141 P. 847, 848 (1914)). The court went on to state the test of whether the tailings were real or personal property in terms similar to the test em-

---

2. For example, the opinion refers to "approximately 98.76 acres of real property.... The property was created over a period of twenty-five years by the dumping of rock and tailings ...." *A.J. Industries,* 397 P.2d at 281. At another point the opinion refers to "the area of land created by the rock and tailings ...." *Id.* at 284. Further, the opinion states, "the fill made by [A.J.] actually converted the tide and submerged lands into ordinary real property located above high water mark." *Id.* at 285. And, on two other occasions the opinion refers to creation of land by the dumping of the tailings. *Id.*

3. This point was made more than once in the opinion.

Thus the opinion states:
> It is conceded that [A.J.], by dumping rock and fill in the area performed basic development work which created land suitable, in fact desirable, for certain business uses. There is no contention that [A.J.] ever evidenced an intent to abandon any portion of the premises, in fact the evidence is that [A.J.] at all times exercised control over the area.

*Id.* at 285.

4. *See Stephen Hays Estate, Inc. v. Togliatti,* 38 P.2d 1066, 1068 (Utah 1934); *Foreman v. Beaverhead County,* 117 Mont. 557, 161 P.2d 524 (1945); Reeves and Aflers, *Dumps and Tailings* 23 Rocky Mtn.Min.L.Inst. 419, 447–50 (1977).

ployed in determining accessions and fixtures:

> The general rule is that "the manner in which the attachment is made, the adaptability of the thing attached to the use to which the realty is applied, and the intention of the one making the attachment determine whether the thing attached is realty or personalty."

*Conway,* 89 P.2d at 1031 (quoting *Montana Electric Co. v. Northern Valley Mining Co.,* 51 Mont. 266, 153 P. 1017, 1018 (1915)).[5]

■ In the present case it is established that A.J. never abandoned the property. The description of A.J.'s uses of the property set forth above makes this clear. It is, however, equally clear that the tailings have become real property.[6] We repeatedly so referred to them in *A.J. Industries.*[7]

Abandonment is but one way by which tailings may become real estate. Other means, as alluded to in the quoted language set forth above, are where the tailings are intended to become real estate, *see Conway,* 89 P.2d at 1029, or are adapted and used as real estate. *Id.* 89 P.2d at 1031. Thus, the conclusion which we reached in *A.J. Industries* that there had been no abandonment is in no sense inconsistent with the conclusion that the tailings were real estate.

The holding in *A.J. Industries* that the tailings were real estate precludes A.J.

from now contending that the tailings are personal property. If the tailings had been considered personal property, no preference right would have been granted, for both the statute and the regulations recognized only permanent improvements as qualifying an applicant for preference rights.[8]

■ Moreover, the conclusion we reached in *A.J. Industries* that the tailings were real property, even though not abandoned, was manifestly correct. We noted that the "dumping was done primarily, if not solely, for purposes of disposal...." 397 P.2d at 284.[9] Where mine tailings are deposited for purpose of disposal, the tailings are considered realty. *See Steinfeld v. Omega Copper Co.,* 16 Ariz. 230, 141 P. 847, 848 (1914); *State v. Superior Court,* 208 Cal.App.2d 659, 25 Cal.Rptr. 363, 367 (1962); *In re Appropriation of Easements for Highway Purposes,* 174 Ohio St. 441, 190 N.E.2d 446, 449 (1963); *Stephen Hays Estate v. Togliatti,* 85 Utah 137, 38 P.2d 1066, 1068 (1934); 6 *American Law of Mining* § 205.07[3], at 205–20 (2d ed. 1986). Moreover, since the tailings were used as fill to create land which supported a tank farm, a radio station, a beam station, a warehouse, a dock, a boat ramp, and storage yards, the tailings were clearly adapted to real estate uses, and by this measure too should be considered realty.[10]

---

5. Compare the trial court's statement in *Stroh v. Alaska State Hous. Auth.,* 459 P.2d 480, 486 (Alaska 1969) (appendix):

 "The rule is that for a chattel to become a fixture and be considered as real estate three requisites must unite: there must be an annexation to the realty of something appurtenant thereto; the chattel must have adaptability or application as affixed to the use for which the real estate is appropriated; and there must be an intention of the party to make the chattel a permanent accession to the freehold." *Sulpher Springs, Etc. v. City of Tombstone,* 1 Ariz.App. 268, 401 P.2d 753, 758 [sic] (1965).

6. Except for materials which may have been stockpiled for sale. *See A.J. Industries,* 397 P.2d at 286.

7. *See supra* note 2.

8. Alaska Statute 38.05.320(d)(1); 11 AAC 120.-214 (eff. 1962).

9. The Director of the Division of Lands, whose decision was affirmed by the Commission of the Department of Natural Resources and eventually by this court in *A.J. Industries,* considered that all the fill was placed for the purpose of waste disposal.

10. With respect to the sale of the tailings, that use is consistent with the tailings being considered either personal or real property. *A.J. Industries* left open the question as to whether some of the tailings which had been sold for building construction purposes might have been "stockpiled on the fill for later sale" and thus was personal property or "had been dumped and had acquired the status of 'fill'" and thus had been a substantial permanent improvement. 397 P.2d at 286. On remand, stockpiled material, if any, should continue to be treated as personal property.

All authorities to which we have been referred hold that when tailings or other mine wastes are deposited in such a manner or with such an intention that they become real estate, they become the property of the owner of the underlying land. *Ritter v. Lynch,* 123 F. 930 (C.C.D.Nev. 1903); *Steinfeld v. Omega Copper Co.,* 16 Ariz. 230, 141 P. 847 (1914); *Baker v. Waite,* 158 Cal.App.2d 379, 322 P.2d 512, 514 (1958); *Foreman v. Beaverhead Co.,* 117 Mont. 557, 161 P.2d 524, 525 (1945); *Conway v. Fabian,* 108 Mont. 287, 89 P.2d 1022 (1939); 6 *American Law of Mining* § 205.07[3], at 205-20 (2d ed. 1986); Lindley, *Mines & Minerals* § 426, at 1009 (3d ed. 1914); Reeves & Alfers, *Dumps and Tailings,* 23 Rocky Mtn.Min.L.Inst. 419, 447-450 (1977). A.J. argues, however, that the tailings involved here are real property whose ownership did not pass to the owner of the land on which they were deposited. We reject this contention because it is not supported by any authority and it conflicts with the authorities cited above.

■ In support of its argument that title to the tailings, as real estate, is separate from the title to the tide and submerged lands, A.J. cites the property description from the 1967 patent which refers to "those Tidelands lying seaward of the mean high tide line in Gastineau Channel." A.J. concludes that this description does not include tailings above mean high tide. This argument lacks merit for several reasons. First, artificial acts such as dumping of tailings do not legally change the point at which mean high tides contact the land. *O'Neill v. State Highway Dep't,* 50 N.J. 307, 235 A.2d 1, 10 (1967). Second, the property description in the patent is a metes and bounds description of surveyed property and is in no sense dependent on the de facto line of mean high water. The survey itself clearly includes the tailings in question. Third, a grant of real estate conveys all of the real estate within the boundaries described unless the grant specifies otherwise.[11] This grant makes no such specification, except the reservation of mineral rights and a 20-foot right-of-way in favor of the United States.

Except for stockpiled material, the tailings are real estate the title to which passed to the State of Alaska. The minerals contained in the tailings were reserved by the state in the 1967 deed. Thus, the conclusion of the superior court that title to the tailings was retained by A.J. is erroneous.[12]

REVERSED and REMANDED for further proceedings.

11. *See generally* 6A R. Powell, *The Law of Real Property* ¶ 887[1], at 81-47 (Rohan rev. ed. 1980).

12. A.J. presents other arguments by which it contends the judgment of the superior court may be affirmed even though they were not relied upon by the superior court. These are that Hayes is estopped from denying A.J.'s title to the minerals in the tailings and that Hayes' mining claims are invalid because they were not properly located. The record does not demonstrate an absence of genuine issues of material fact relating to these points and thus they will not support an affirmance.