#24473-a-JKM

**2007 SD 120**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DEWAYNE C. TVEIDT, as Special
Administrator for the ESTATE OF
ESTHER A. TVEIDT,                                        Plaintiff and Appellant,

   v.

ZANDSTRA CONSTRUCTION, INC.,                  Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JEROME A. ECKRICH, III
Judge

* * * *

JOHN W. BURKE of
Thomas, Nooney, Braun, Solay
  & Bernard, LLP                                        Attorneys for plaintiff
Rapid City, South Dakota                           and appellant.

ERIC J. PICKAR
TERRY L. HOFER of
Bangs, McCullen, Butler,
  Foye & Simmons, LLP                             Attorneys for defendant
Rapid City, South Dakota                           and appellee.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 27, 2007

OPINION FILED **11/14/07**

MEIERHENRY, Justice

[¶1.]    Dewayne Tveidt (Tveidt), as Special Administrator for the Estate of Esther A. Tveidt, appeals a summary judgment order in favor of Zandstra Construction, Inc. (Zandstra).  The dispute involved the interpretation of a contract entered into between the parties in conjunction with a South Dakota Department of Transportation (DOT) highway project.  The project involved construction of U.S. Highway 14A between Sturgis and Deadwood, South Dakota, and was referred to as the Boulder Canyon Project.  DOT contracted with local ranchers and landowners, Esther and Lewis Tveidt, to use their land to dispose of excess embankment material (DOT-Tveidt Contract).  Pursuant to the DOT-Tveidt Contract, DOT would be allowed to deposit 300,000 cubic yards of excess material on Tveidt's property in return for compensation.

[¶2.]    DOT also contracted with Zandstra (DOT-Zandstra Contract) to serve as the general contractor on the Boulder Canyon Project.  As part of the DOT-Zandstra Contract, Zandstra was required to install thousands of tons of riprap (large stones or chunks of concrete) along the banks of the Bear Butte Creek for erosion control.  According to the undisputed facts, the DOT-Zandstra Contract incorporated the DOT-Tveidt Contract.

[¶3.]    Zandstra contracted with Tveidt (Zandstra-Tveidt Contract) to pay them for a "return haul road" and to purchase "riprap produced on their property." The Zandstra-Tveidt Contract permitted Zandstra to "[u]se an area on Tveidt's property to screen and store riprap . . . ."  The conditions of the contract specified that Zandstra would compensate Tveidt in the amount of $30,000.00 for a return

haul road and an additional $2.50 per ton of riprap "produced on [Tveidt's] property." In addition to this compensation, Zandstra was bound to "reseed and reclaim" the affected area and backfill a pipe installed by Tveidt.

[¶4.] Zandstra, as general contractor, was responsible for transporting the excess embankment, described in the DOT-Tveidt Contract, to Tveidt's land. After transporting the excess embankment material to Tveidt's land, Zandstra screened the embankment for riprap, setting any usable riprap to the side for eventual application to the project. Additionally, Zandstra unearthed riprap from Tveidt's property, which also was screened and used on the project.

[¶5.] Upon completion of the Boulder Canyon Project, Zandstra had hauled a total of 56,931.10 tons of riprap from Tveidt's property. This total represented riprap from two sources (1) riprap produced by screening the material unearthed from Tveidt's property (9,948.34 tons) and (2) riprap produced by screening the excess embankment material that had been hauled onto Tveidt's property pursuant to the DOT-Tveidt Contract (46,982.76 tons). Zandstra tendered payment for the 9,948.34 tons of riprap produced from material unearthed from Tveidt's property. Tveidt subsequently commenced an action alleging that Zandstra had an obligation to pay for all of the riprap that it screened from the excess embankment material. The trial court granted Zandstra's motion for summary judgment, finding that the Zandstra-Tveidt Contract only obligated Zandstra to pay for riprap unearthed from Tveidt's property. Tveidt claims that the trial court erred.

[¶6.] Specifically, Tveidt contends that (1) they owned the excess embankment material from which 46,982.76 tons of the riprap were produced and

(2) pursuant to the Zandstra-Tveidt Contract, Zandstra had an obligation to pay for the riprap that it produced from the excess embankment material. Since there are no material facts in dispute, our review is limited to whether the law was correctly applied. Kling v. Stern, 2007 SD 51, ¶5, 733 NW2d 615, 617.

[¶7.]       The construction of a contract is a question of law which we review de novo. *Id*. As this is a matter of contract interpretation, the plain meaning of the words of the contract will be given effect. *In re* Dissolution of Midnight Star Enterprises, L.P. ex rel. Midnight, 2006 SD 98, ¶12, 724 NW2d 334, 337. "An interpretation which gives a reasonable and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable or of no effect." *Id*. (quoting Nelson v. Schellpfeffer, 2003 SD 7, ¶14, 656 NW2d 740, 744 (citing RESTATEMENT (SECOND) CONTRACTS §203 (a) (1981))). When interpreting the contract, "[w]e must 'give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation.'" *Id*. (quoting Jones v. Siouxland Surgery, 2006 SD 97, ¶15, 724 NW2d 340, 345) (quoting Hartig Drug Co. v. Hartig, 602 NW2d 794, 797-98 (Iowa 1999))). The parties direct us to provisions in both the DOT-Tveidt Contract and the Tveidt-Zandstra Contract. Both contracts dealt with the same subject matter and when read together define the intent of the parties in relationship to the excess embankment material, the riprap and its production.

*1. The DOT-Tveidt Contract*

[¶8.]       Tveidt claims that pursuant to the DOT-Tveidt Contract, the excess embankment material hauled on the property to be stored and screened became the

personal property of Tveidt entitling the Estate to payment. As support, Tveidt cites to the absence of language in the DOT-Tveidt Contract suggesting that ownership of the excess embankment material would remain with DOT, and the absence of language that suggests that DOT would have the right to screen riprap from the excess embankment material. Tveidt claims that the contract only allowed DOT and its agents to have a right of ingress and egress for the purpose of depositing but not removing excess embankment materials.

[¶9.] Zandstra, on the other hand, argues that DOT only contracted with Tveidt for storage and waste of the excess embankment material. In support of its argument, Zandstra points to the absence of any language that suggests that the excess embankment material would become the property of Tveidt. Zandstra argues that the language of the contract implies that any excess waste material would not become property of Tveidt until the area was graded to specification, reseeded and re-fenced.

[¶10.] In order to resolve the issue of ownership, we look at the language of both the DOT-Tveidt Contract and the Zandstra-Tveidt Contract, as both parties suggest. The DOT-Tveidt Contract is a five page document detailing the rights and responsibilities of DOT in regards to its use of Tveidt's property. Among other things, the contract granted DOT a right of ingress and egress for the purpose of depositing excess embankment material and allowed for DOT's continued use of Tveidt's property until the Boulder Canyon Project was complete. The contract also required DOT to restore the property to its original condition after the project was completed.

#24473

[¶11.] The DOT-Tveidt Contract noted that the purpose of the contract was for "depositing approximately 300,000 cubic yards of excess embankment materials." For depositing the excess embankment material, DOT agreed to pay Tveidt "a total compensatory sum of $90,000.00" plus an additional amount of $2,500.00 for loss of trees "bring[ing] the total compensatory amount to $92,500.00 for the placement of waste material." The contract provided additional compensation "[i]f the quantity of excess embankment material exceed[ed] 300,000 cubic yards, . . . at a rate of $0.25 per cubic yard of rock/dirt in excess of 300,000 cubic yards." The contract specified that "[t]he method of measurement to determine the actual quantity of waste material will be by cross sections taken before and after on the roadway project."

*2. The Zandstra-Tveidt Contract*

[¶12.] The Zandstra-Tveidt Contract consisted of a one page form and in its entirety read as follows:

> The agreement made this 22nd day of May, 2000, between Zandstra Construction, Inc. . . . and Ester [sic] A. and Lewis Tveidt, . . . .
>
> Zandstra Construction, Inc. hereby agrees to:
>
> Pay Tveidt's $30,000.00 for return haul road 35' wide.
> Pay Tveidt's $2.50 per ton for riprap produced on their property.
>
> Additional Conditions:
>
> Return haul road will need to be 35' wide. We will reseed & reclaim when hauling is complete. All stumps from project will be buried in Tveidt's waste area. Use an area on Tveidt's property to screen and store riprap, we will reseed this area when completed. Not all riprap for this project will be produced in Tvedt'd [sic] property. We will grade a trail south of Highway on Tveidt's property. We will also dig a

-5-

trench from the spring at STA 514+00 to the sleeve.  Tveidt will install a pipe from the spring to the sleeve.  We will then backfill pipe.

[¶13.]     The Zandstra-Tveidt Contract provided that Tveidt would receive "$2.50 per ton for riprap produced on their property."  By using the word "produced," Tveidt argues that, by definition, Zandstra had an obligation to pay for any riprap "brought into existence" or "created" on Tveidt's property.  *See* Black's Law Dictionary 1245 (8th ed 2004).  Even if we were to accept this definition of the term "produced," Tveidt's argument fails.  The riprap obtained from the excess embankment material was not created on Tveidt's property.  In other words, it did not have its origin from Tveidt's property.  Rather, the DOT moved it from the Boulder Canyon Project and placed it on Tveidt's property for storage purposes.  In contrast, the 9,948.34 tons of riprap that Zandstra tendered payment for had its origin in Tveidt's property.  Furthermore, Black's Law Dictionary also defines "produced" as "to bring (oil, etc.) to the surface of the earth."  Black's Law Dictionary 1245 (8th ed 2004).  The riprap produced from the excess material had already been brought to the surface of the earth when it was placed on Tveidt's property.  Therefore, under both of these definitions, the term "produced" does not apply to the riprap obtained from the excess embankment material.

[¶14.]     Tveidt further argues the excess embankment material became the property of the Tveidts once placed on their property.  Tveidt cites *Hayes v. Alaska Juneau Forest Industries, Inc.*, a case dealing with the deposit of mine tailings, as support for this position.  748 P2d 332, 336 (Alaska 1988).  In *Hayes*, the Alaska Supreme Court stated that "[a]ll authorities to which we have been referred hold that when tailings or other mine wastes are deposited in such a manner or with

such an intention that they become real estate, they become the property of the owner of the underlying land." *Id.* at 337. However, in *Hayes* the minerals were deposited for the purpose of disposal, "as distinct from being stockpiled for future use." *Id.* at 334-35. Zandstra, as an agent of DOT, did not dispose of excess embankment material; it screened and stored the riprap for future use. This is not indicative of an intent to abandon the riprap, as required in *Hayes. Id.* at 335. The *Hayes* Court recognized that the minerals did not change ownership until they were abandoned; stating: "[t]he concept of abandonment plays an important role . . . . If the tailings are 'abandoned' they become real estate, if they are not abandoned they remain the personal property of the mine or mill which created them." *Id.* at 335. Neither Zandstra nor the DOT abandoned any of the excess embankment until after the completion of the Boulder Canyon Project. The Zandstra-Tveidt Contract and the DOT-Tveidt Contract further emphasize this fact.

[¶15.] The DOT-Tveidt Contract stated the quantity of excess embankment would be determined by measuring "cross sections taken before and *after* the roadway project." (Emphasis added). This measurement clause clearly states that DOT would only pay Tveidt for the excess embankment remaining on the property at the conclusion of the roadway project. It further implies that excess embankment material may be removed from Tveidt's land prior to the roadway project's completion. Hence, the property was not abandoned until the conclusion of the Boulder Canyon Project. The Zandstra-Tveidt Contract also contradicts the *Hayes* analogy.

[¶16.] The Zandstra-Tveidt Contract referred to both "stored" riprap and "produced" riprap. It provided that Tveidt's land would be used to "screen and *store* riprap." (Emphasis added). It further provided, "[n]ot all riprap for this project will be produced in Tvedt'd [sic] property," a reasonable interpretation of the two provisions is that the parties agreed that not all of the "stored" riprap would be "produced" in Tveidt's property. In other words, some of the stored riprap would come from another source. Rationally, another source of riprap was the excess embankment material Zandstra stripped from the Boulder Canyon Project area and transported to Tveidt's land. Moreover, there would be no reason to "store" riprap which was already part of Tveidt's land. When interpreting a contract we prefer to give effect to all its terms, rather than "an interpretation which leaves a part unreasonable or of no effect." *In re* Dissolution of Midnight Star Enterprises, L.P. ex rel. Midnight, 2006 SD 98, ¶12, 724 NW2d at 337 (quoting Nelson v. Schellpfeffer, 2003 SD 7, ¶14, 656 NW2d 740, 744 (citing RESTATEMENT (SECOND) CONTRACTS § 203(a) (1981))).

[¶17.] Neither the DOT-Tveidt Contract nor the Zandstra-Tveidt Contract obligated Zandstra to compensate Tveidt for riprap screened from the excess embankment material; therefore, we find no error in the trial court's grant of summary judgment.

[¶18.] Affirmed.

[¶19.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.