Howard C. HAYES and Michael R. Hayes, Appellants,

v.

A.J. ASSOCIATES, INC.; Alaska Marine Lines, Inc.; Gordon S. Harang; and Eileen K. Harang, Appellees.

Howard C. HAYES and Michael R. Hayes, Appellants/Cross–Appellees,

v.

Jim JANSEN; Lynden, Inc.; Reed Stoops; A.J. Associates, an Alaska corporation; Gordon and Eileen Harang; Arrowhead Transfer; Alaska Marine Lines, Inc.; Bank of California, a foreign corporation; and John Does 1 through 5, Appellees/Cross–Appellants.

Nos. S–6736, S–7185/7215.

Supreme Court of Alaska.

May 22, 1998.

Henry J. Camarot, Anchorage, for Appellants/Cross–Appellees.

James N. Reeves, Bogle & Gates, Anchorage, for Appellees/Cross–Appellants.

Lawrence Z. Ostrovsky, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Before RABINOWITZ, MATTHEWS, EASTAUGH, JJ., and SHORTELL*, J., pro tem.

EASTAUGH, Justice.

## I. INTRODUCTION

These consolidated appeals concern eight mining claims filed by Howard Hayes and his

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

son, Michael, on Alaska–Juneau Gold Mine tailings.[1] In S–6736 Hayes appeals from a superior court order ejecting him from Taku Nos. 1 and 2 for staking those claims without obtaining the consent of the landowners or posting a surety bond. In S–7185 Hayes appeals from a partial summary judgment dismissing most of his tort claims against Jim Jansen and others relating to the eight mining claims. In S–7215 the landowners appeal from an order denying them summary judgment on another of Hayes's tort claims. We affirm in part, reverse in part, and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

These cases concern rights to part of Alaska Tidelands Survey No. 201 (ATS 201), near downtown Juneau. The Alaska–Juneau Gold Mine operated near Gastineau Channel from 1914 until 1944. State v. A.J. Indus., Inc., 397 P.2d 280, 281 (Alaska 1964). It daily generated as much as 13,000 tons of crushed rock and mill tailings, which were dumped onto adjacent tidelands and then onto submerged lands under the channel. Id. Dumping eventually resulted in "considerable acreage of real property ... well above high water," including the property in dispute in these cases. Id. Various predecessors to the present landowners used the property from 1937 onwards.[2] Three previous opinions of this court addressed disputes relating to ownership of and mineral rights to this property. Hayes v. A.J. Assocs., Inc., 846 P.2d 131 (Alaska 1993); Hayes v. Alaska Juneau Forest Indus., Inc., 748 P.2d 332 (Alaska 1988); State v. A.J. Indus., Inc., 397 P.2d 280 (Alaska 1964).

In State v. A.J. Industries, the court held that the landowners were entitled to a preference right to obtain title to nearly 100 acres of property created by the disposal of rock and mill tailings. 397 P.2d at 281, 287. The State subsequently issued a patent transferring the property to the landowners. As required by AS 38.05.125(a), the patent expressly reserved mineral rights to the State.[3]

In 1981 the landowners executed a mining lease permitting Hayes to extract merchantable ore, including gold, from the property.[4] The lease expired December 31, 1981; Hayes nonetheless remained on the property and continued to mine. When negotiations for a new lease failed, Hayes staked mining claims Taku Nos. 1 and 2 on the property in 1982.[5] A.J. Assocs., 846 P.2d at 132; Alaska Juneau Forest Indus., 748 P.2d at 334. The landowners filed an ejectment action as to those two claims, and Hayes counterclaimed, asserting he had acquired mineral rights from the State by staking valid claims. 748 P.2d at 334. The superior court granted summary judgment to the landowners, ruling that the tailings had not passed to the State under the Alaska Statehood Act, Public Law No. 85–508, 72 Stat. 339 (1958) (see note preced-

---

1. Both Hayeses are parties to these appeals. For convenience we refer to Howard Hayes and Michael Hayes in the singular as "Hayes" except when context requires specificity.

2. A.J. Associates, Alaska Marine Lines, Inc., Gordon S. Harang, and Eileen S. Harang are successors in interest to A.J. Industries and A.J. Forest Industries. See Hayes v. A.J. Assocs., Inc., 846 P.2d 131, 132 (Alaska 1993).

 Hayes sued A.J. Associates, Alaska Marine Lines, Inc., the Harangs, Jim Jansen, Lynden, Inc., Reed Stoops, Arrowhead Transfer, and Bank of California in Hayes v. Jansen, No. 1JU–93–0397 Ci (Alaska Super., June 16, 1994). Lynden, Inc. and Arrowhead Transfer have ownership interests in the property. Jim Jansen is president of Lynden Inc. Reed Stoops is president of A.J. Associates. Bank of California had an ownership interest in the property at potentially pertinent times. We refer to all parties adverse to Hayes as "the landowners."

3. The patent reserved to the State, "its lessees, successors, and assigns forever, all oils, gases, coal, ores, minerals, fissionable materials, and fossils of every name, kind or description," as well as "the right to explore" the property for such materials and "the right to enter ... upon said lands, or any part or parts thereof, at any and all times for the purpose of opening, developing, drilling and working mines or wells on these or other lands, and taking out and removing therefrom all such ... ores, minerals...."

4. Howard Hayes began to recover gold from the tailings in about 1954. His son Michael later joined these efforts.

5. Hayes staked two adjacent claims, Taku Nos. 3 and 4, in 1987. Hayes also acquired four other claims on ATS 201, Taku Nos. 5–8. These claims had been staked by a third party in 1988. They are coextensive with Taku Nos. 1–4.

ing 48 U.S.C. § 21 (1976)). *Id.* This court reversed in 1988, concluding that the tailings were real estate that had consequently passed to the State under the Statehood Act. *Id.* at 336. Because the minerals in the tailings were reserved to the State in the patent transferring the property to the landowners, they were subject to valid mining claims. The case was remanded for further proceedings. In 1989, the Alaska Department of Natural Resources (DNR) granted Hayes a production license authorizing "the production of minerals for sale, subject to other applicable statutes and regulations."

Upon remand, the superior court again granted summary judgment to the landowners, concluding that because Hayes had not made his mineral locations in good faith, the locations were void. *A.J. Assocs.*, 846 P.2d at 131. This court reversed and again remanded, holding that Hayes did not owe the landowners a duty of good faith location. *Id.* at 134–35.

Following this remand, the case was reassigned to Superior Court Judge Thomas M. Jahnke, who again granted summary judgment to the landowners. It ruled that Hayes's failure to obtain the landowners' consent or post a surety bond made the locations for Taku Nos. 1 and 2 invalid under AS 38.05.130, rendering Hayes a trespasser who was subject to ejectment. The trial court denied Hayes's motions for reconsideration and Rule 60(b) relief and granted attor-

ney's fees to the landowners. Hayes appeals in S–6736 from those rulings.

In 1993 Hayes filed a tort suit against the landowners, ultimately asserting seven counts of tortious conduct by the landowners. When the landowners moved for summary judgment, the superior court found that genuine fact disputes existed with regard to Hayes's claims that the landowners had destroyed Hayes's monuments, stakes, markers, and other structures, but granted summary judgment to the landowners on Hayes's remaining claims. The superior court declined to dispose of two of Hayes's other claims via summary judgment: (1) the "claimed right to enter to stake claims" on the remaining six claims; and (2) the "claim that A.J. or its agents destroyed Hayes's access road to ATS 201." The court denied all motions for reconsideration and entered a Rule 54(b) final judgment. Hayes and the landowners appeal from these rulings in S–7185 and S–7215.

### III. *DISCUSSION*

A. *Hayes v. A.J. Associates: Effect of Hayes's Failure to Obtain Consent or Post a Bond before Staking*

1. *Acquisition of State-held mineral interests*

The landowners acquired ATS 201 subject to the State's reserved mineral rights and its right to explore for and extract those minerals. AS 38.05.125(a);[6] *Hayes v. Alaska Ju-*

---

**6.** AS 38.05.125(a) provides:

Each contract for the sale, lease or grant of state land, and each deed to state land, properties or interest in state land, made under AS 38.05.045–38.05.120, 38.05.321, 38.05.810–38.05.821, AS 38.08, or AS 38.50 except as provided in AS 38.50.050 is subject to the following reservations: "The party of the first part, Alaska, hereby expressly saves, excepts and reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, all oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils of every name, kind or description, and which may be in or upon said land above described, or any part thereof, and the right to explore the same for such oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils, and it also hereby expressly saves and reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, the right to enter by

itself, its or their agents, attorneys, and servants upon said land, or any part or parts thereof, at any and all times for the purpose of opening, developing, drilling, and working mines or wells on these or other land and taking out and removing therefrom all such oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils, and to that end it further expressly reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, the right by its or their agents, servants and attorneys at any and all times to erect, construct, maintain, and use all such buildings, machinery, roads, pipelines, powerlines, and railroads, sink such shafts, drill such wells, remove such soil, and to remain on said land or any part thereof for the foregoing purposes and to occupy as much of said land as may be necessary or convenient for such purposes hereby expressly reserving to itself, its lessees, successors, and assigns, as aforesaid, generally all rights and power in, to,

*neau Forest Indus.*, 748 P.2d at 337 (holding that AS 38.05.125(a) reserved to the State the mineral rights in ATS 201).

The superior court, in a lengthy and thoughtful memorandum decision, held that AS 38.05.130 and 11 AAC 96.140(10) obliged Hayes to either obtain the landowners' consent or post a surety bond before entering in 1982 to stake Taku Nos. 1 and 2. The court concluded that Hayes's failure to do so invalidated those two claims, requiring ejectment.[7] It implicitly reasoned that (1) staking is "exploration," an activity reserved by subsection .125(a), and (2) section .130 applies to the exercise of any right reserved under subsection .125(a).[8]

Hayes attacks these conclusions on various grounds.[9] Most fundamentally, he asserts that section .130 did not apply to his 1982 entry to stake. He reasons that section .130 only imposes obligations on the exercise of rights reserved pursuant to AS 38.05.125(a), and that the right to enter to stake a mineral location is not a right reserved by subsection .125(a).[10]

 We begin our analysis by recognizing that statutes and regulations govern how others may acquire the State's mineral rights. Discovery and appropriation are the basis for acquiring such rights. Alaska

and over said land, whether herein expressed or not, reasonably necessary or convenient to render beneficial and efficient the complete enjoyment of the property and rights hereby expressly reserved."

The subsection .125(a) reservation is mandated under the terms of section 6(i) of the Alaska Statehood Act as to lands known to contain valuable minerals at the time of state selection. Section 6(i) provides in relevant part:

The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express conditions that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the state of all the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the state as the state legislature may direct: *Provided*, that any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the attorney general for that purpose in the United States District Court for the District of Alaska.

*See Trustees for Alaska v. State*, 736 P.2d 324, 331–42 (Alaska 1987) (discussing history and purpose of the reservation of mineral rights to the State).

7. Superior Court Judges Walter L. Carpeneti and Thomas E. Schulz had previously concluded that Hayes was required to comply with AS 38.05.130 before entering the land to stake these two claims, but failed to do so.

8. AS 38.05.130 provides:

**Damages and posting of bond.** Rights may not be exercised by the state, its lessees, successors or assigns under the reservation as set out in AS 38.05.125 until the state, its lessees, successors, or assigns make provision to pay the owner of the land full payment for all damages sustained by the owner, by reason of entering

upon the land. If the owner for any cause refuses or neglects to settle the damages, the state, its lessees, successors, assigns, or an applicant for a lease or contract from the state for the purpose of prospecting for valuable minerals, or option, contract or lease for mining coal or lease for extracting geothermal resources, petroleum or natural gas, may enter upon the land in the exercise of the reserved rights after posting a surety bond determined by the director, after notice and an opportunity to be heard, to be sufficient as to form, amount, and security to secure to the owner payment for damages, and may institute legal proceedings in a court where the land is located, as may be necessary to determine the damages which the owner may suffer.

9. We do not consider Hayes's opening argument that the landowners lack standing to seek ejectment because they have no interest in the minerals Hayes seeks to mine. In a decision issued prior to Hayes's last appeal, the superior court held that the landowners had standing to seek ejectment. Because Hayes did not appeal that ruling, we choose to treat it as final and as law of the case as to the ejectment action. *Cf. Austin v. Fulton Ins. Co.*, 498 P.2d 702, 704 (Alaska 1972) (stating that trial court holding not disputed in appellant's prior appeal would be law of the case in a subsequent appeal between the same parties). *But cf. Siggelkow v. State*, 731 P.2d 57, 59 n. 1 (Alaska 1987) (holding law of case did not preclude consideration of issue of jurisdiction not raised by appellant in his prior appeal); *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977) (holding law of the case did not preclude consideration of issue raised in prior unsuccessful petition for review that did not determine the merits of the issue).

10. This issue turns on statutory interpretation and is subject to our independent review. *Sauve v. Winfree*, 907 P.2d 7, 9 (Alaska 1995); *Hood v. State*, 574 P.2d 811, 813 (Alaska 1978).

Const. art. VIII, § 11.[11] Alaska Statute 38.05.185(a) provides that the acquisition of rights in deposits on State land of minerals subject to location is governed by AS 38.05.185—38.05.275.[12] Gold is a mineral subject to location. 1 *American Law of Mining* § 8.01[3], at 8–4 (The Rocky Mountain Mineral Law Foundation ed., 2d ed.1994). Subsection .185(a) also provides that State land "may not be closed to mining or mineral location" unless the DNR commissioner finds that mining would be incompatible with significant surface uses and unless AS 38.05.300 (which authorizes the commissioner to close State lands to "mining, mineral entry or location, mineral prospecting, or mineral leasing" under specified conditions) is also satisfied. Alaska Statute 38.05.185(a) thus keeps State land open to mineral location unless the commissioner specifically closes it.

 Under AS 38.05.195, "[r]ights to deposits of minerals subject to AS 38.05.185–38.05.275 in or on state land that is open to claim staking may be acquired by discovery, location and recording." [13] Likewise, leasehold preferences in State mineral lands available only for leasing may be acquired by "discovery, location and recording...." AS 38.05.205(a). "State land" is broadly defined to mean "*all land*, including shore, tide and submerged land *or resources belonging to*" the State. AS 38.05.965(19) (emphasis added). "State land" thus includes the State's reserved mineral estate.[14] *See also* 11 Alaska Administrative Code (AAC) 86.135 (1996). The mineral estate in ATS 201 was consequently "state land." [15]

**11.** Article VIII, section 11 of the Alaska Constitution provides in part that "Discovery and appropriation shall be the basis for establishing a right" in minerals reserved to the State and subject to location. It also provides that "[p]rior discovery, location, and filing, as prescribed by law, shall establish a prior right" to "minerals reserved to the State which, upon the date of ratification of this constitution ... were subject to location under the federal mining laws."

11 AAC 86.105 provides: "DISCOVERY DEFINED. 'Discovery' means a finding of valuable mineral as would justify an ordinarily prudent person in expending further time, labor, and money upon the property with a reasonable expectation of developing a paying mine."

11 AAC 86.200 provides: "DISCOVERY REQUIRED. No mining claim location is complete until after the discovery, as defined in 11 AAC 86.105, of locatable minerals within the limits of the claim."

**12.** AS 38.05.185(a) provides:

(a) The acquisition and continuance of rights in and to deposits on state land of minerals, which on January 3, 1959, were subject to location under the mining laws of the United States, shall be governed by AS 38.05.185–38.05.275. Nothing in AS 38.05.185 –38.05.275 affects the law pertaining to the acquisition of rights to mineral deposits owned by any other person or government. The director, with the approval of the commissioner, shall determine that land from which mineral deposits may be mined only under lease, and, subject to the limitations of AS 38.05.300, that land that shall be closed to mining. State land may not be closed to mining or mineral location except as provided in AS 38.05.300 and unless the commissioner makes a finding that mining would be incompatible with significant surface uses on the state land. State land may not be restricted to mining under lease unless the commissioner determines that potential use conflicts on the state land require that mining be allowed only under written leases issued under AS 38.05.205 or the commissioner has determined that the land was mineral in character at the time of state selection. The determinations required under this subsection shall be made in compliance with land classification orders and land use plans developed under AS 38.05.300.

**13.** DNR regulations in force at pertinent times described the technical requirements for discovery, location, and recording. 11 AAC 86.200–.225 (1996). "Staking" is accomplished by placing stone or post monuments at the four corners of the claim or leasehold location, 11 AAC 86.205, with a notice on the northeast monument, 11 AAC 86.210.

**14.** It is apparently this sentence to which the dissenting opinion of Justice Rabinowitz refers in stating at page 52 that "[T]he court relies on the definition section of the mining code to conclude that 'state land' includes privately-owned surface lands if the state has retained the mineral rights." We draw no such conclusion in that sentence or elsewhere in this opinion. Privately owned surface lands are not "state land" even though the State has reserved mineral rights in them under AS 38.05.125(a). That reservation clearly does not make the surface estate "state land."

**15.** It is interesting to look at the 1959 Alaska Lands Act in conjunction with the 1961 Amendments. Article IX of the 1959 Act expressly covered reserved mineral rights by stating that on lands conveyed to others in which mineral rights were reserved to the State, the right to mine and remove the minerals could only be acquired by lease. Article IX was amended in 1961; the

Justice Rabinowitz's dissent relies on *State v. Weidner*, 684 P.2d 103 (Alaska 1984), but that case did not concern the effect of the subsection .125(a) reservation, or any question whether the State's reserved mineral interest remained state land.

Our interpretation here is supported by a 1993 Attorney's General opinion: "Because the term 'state lands' is defined to include all lands and interests in lands belonging to or acquired by the state, AS 38.05.965(19), all state-owned severed mineral interests, including reserved mineral interests, are subject to location. 11 AAC 86.135." 1993 Informal Op. Att'y Gen. 563, 564. *See also Moore v. State*, 553 P.2d 8, 25 (Alaska 1976), where we stated:

> We note that sections found throughout the Alaska Land Act utilized the word "land" in such a way that it could only be interpreted as encompassing resources within the scope of its meaning. Admittedly, in certain provisions of the act the word "land" is used in a manner inconsistent with the statutory definition of the term. However, instances of such inconsistencies are few in number, and bear no special contextual significance to AS 38.05.305. Under the definition section of the act, statutory definitions are to apply "unless the context otherwise requires." We find nothing about the context of AS 38.05.305 which would imply that the statutory definition of the word "land" should be disregarded.

(Footnotes omitted.)

Justice Rabinowitz's dissent argues that section .185 was not intended to allow staking of claims on lands conveyed by the State. The State's amicus brief states what we believe to be the proper reading of the mining code: "When the state conveys a surface estate to another party, the state is required to reserve both the minerals and the right to explore and develop them. *Mineral interests on these 'split estate' lands are subject to the location of state mining claims in the same manner as on lands owned entirely by the state.*" (Emphasis added.) *See also* 3 *American Law of Mining* § 71.03[5], at 43 (2d ed. 1984 & 1997 Supp.).

█ Justice Rabinowitz is concerned that location activities will interfere with quiet enjoyment of surface rights. Dissent at 53–55. Owners of surface estates must anticipate that the State's reserved rights might someday be exercised. The dissent's concerns should not alter the result required by the mining code. They should instead be addressed either by a finding by the commissioner that mining would be incompatible with surface use, AS 38.05.185(a), or by a claim for appropriate remedies for undue interference with those rights.

The dissent also relies upon the history of the 1981 amendment of AS 38.05.185. As we read that history, however, the legislature in 1981 simply limited the commissioner's discretion in determining what mineral lands would be exclusively subject to entry under lease. The dissent argues that the amendment applied only to lands in which the State retained the surface estate. If so, the amendment is irrelevant here because it did not limit the commissioner's discretion in dealing with land conveyed by the State subject to the subsection .125(a) reservation. The amendment did not change the definition of "state land."

2. *State's reservation of its mineral rights* [16]

Whereas AS 38.05.185–38.05.275 describe how others may acquire the State's reserved

---

legislature delegated authority to the director to determine "those lands which mineral deposits may only be mined under lease." Article IX, ch. 3, SLA 1961. The term "[t]hose lands" encompasses all lands previously enumerated in Article IX before amendment, including "lands which have been sold ... reserving such minerals to Alaska. ..." *See* AS 38.05.185(a).

**16.** Two members of the court, Justice Matthews and the author, join in the analysis contained in Part III.A.2 of this opinion, and are of the opinion that AS 38.05.130 and 11 AAC 96.140(10) did not apply to Hayes's staking activity in 1982. Two other members, Justice Rabinowitz and Justice Shortell, conclude in their separate opinions that Hayes's staking activity on ATS 201 constituted "exploration" and was therefore subject to AS 38.05.130 and 11 AAC 96.140(10). Given this two-two split, this court affirms the superior court's conclusion that the statute and regulation applied to Hayes's staking activity.

mineral rights, AS 38.05.125(a) describes the scope of those reserved rights. Subsection .125(a) reserves to the State minerals and other resources on land sold or granted by the State. It also reserves "the right to explore the same" for those minerals and things, and "expressly saves and reserves ... the right to enter ... upon said land ... for the purpose of opening, developing, drilling and working mines or wells...." AS 38.05.125(a).

Alaska Statute 38.05.130 concerns exercise of rights "under the reservation as set out in AS 38.05.125...." Whether section .130 covers the physical act of staking, and whether Hayes's unconsented, unbonded entry to stake in 1982 violated AS 38.05.130, depends on whether subsection .125(a) covers staking. Subsection .125(a) does not mention either "staking" or "locating," but it reserves the right to "explore."

The term "explore" is not defined in Alaska Statutes titles 27 or 38 or the State's mining regulations. In applying subsection .125(a), we read "explore" to have its common meaning: "to seek for or after ... to search through or into ... to examine minutely ... to penetrate into or range over for purposes of geographical discovery ... to make or conduct a systematic search...." *Webster's Third New International Dictionary* (unabridged) 802 (1969). Black's defines "exploration" in context of mining law as "[t]he examination and investigation of land supposed to contain valuable minerals, by drilling, boring, sinking shafts, driving tunnels, and other means, for the purpose of discovering the presence of ore and its extent." *Black's Law Dictionary* 579 (6th ed.1990). These definitions are consistent with how "exploration" is used in Alaska Statutes titles 27 and 38. *Cf.* AS 27.05.010 (seemingly distinguishing among "exploration, development and mining"). The *American Law of Mining* states:

Mineral exploration is the orderly search for previously undiscovered or unrecognized ore deposits.... Exploration typically involves a succession of steps, involving the application of both inductive and deductive concepts, in which the explorationist seeks first to locate and then to recognize or "prove up" a discovery of a minable deposit by utilizing known or theorized deposit models as a guide to ore deposits.

1 *American Law of Mining* § 1.03[1], at 1–41. We conclude that "explore" does not encompass in its common or mining usage the limited and discrete physical act of staking (placing corner monuments with an appropriate notice) carried out by Hayes in 1982.

Staking satisfies one of the requirements for acquiring a mineral claim or leasehold preference on public land. *See supra,* note 13. It is not surprising that subsection .125(a) says nothing of staking, given that its focus is on reserving the State's rights, not on how others can acquire those rights from the State.

The focus of subsection .125(a) is also consistent with its origin. Subsection .125(a) seems intended to fulfill the reservation requirement, contained in the Alaska Statehood Act, Act of July 7, 1958, Public Law No. 85–508, 72 Stat. 339 § 6(i), as amended 48 U.S.C. § 21 (1988), which was a condition of the federal transfer of vast amounts of land to Alaska upon statehood. *See Trustees for Alaska v. State,* 736 P.2d 324, 326 (Alaska 1987). Subsection 6(i) of the Statehood Act required the State to reserve its mineral rights in lands known to be mineral in character. *Id.* at 341. In requiring that reservation, Congress was concerned with ensuring that the State reserved the rights that would make it economically self-sufficient, *see id.* at 335, and not with how persons might enter onto those lands in seeking to acquire rights from the State through the process of claim or leasehold location.

To read subsection .125(a) in this fashion does not impair the State's rights because the State reserves the right to explore and does not have to stake to obtain mineral rights it already possesses. Nor does this reading significantly affect prospecting practices. It will be rare that claim location will ever be based on "immaculate" staking.[17]

17. The State in its amicus brief has hypothesized several situations in which the only physical en-

From a practical standpoint, this interpretation of subsection .125(a) does not lessen the protection AS 38.05.130 gives the owners of lands, such as ATS 201, that are subject to the subsection .125(a) reservation. Section .130 is concerned exclusively with compensating the landowner for damages resulting from entries during exercise of rights reserved under subsection .125(a). Exploration, including discovery of locatable minerals, is the prospecting activity that is predictably most damaging to the surface estate. Staking, as such, requires acts (placing corner markings and posting notice) that are unlikely to damage the surface estate. Also, often any successful exploration which is part of the location process will be relatively contemporaneous with staking, and the mandatory agreement or bond covering exploration will encompass all aspects of the prospector's activities, including staking. That, however, is not the situation here, where the landowners contend that the limited act of staking alone, without more, violates section .130, and do not assert that Hayes did anything other than enter for the limited purpose of staking.[18]

Absent a claim the staking entry itself caused financial harm to the landowners' estate, the type of protection contemplated by section .130 (financial indemnification) is inapplicable. As long as the landowner is financially protected against damage, the would-be explorer can enter without offending section .130.

Section .130 does not purport to protect a simple right of quiet enjoyment, but addresses only harm that can be remedied by compensation.[19] A purchaser of lands sold subject to the subsection .125(a) reservation must anticipate that the reserved rights might someday be exercised. Section .130

does not allow the landowner to altogether close the land to entry by persons seeking to exercise those rights, much less prevent a prospective locator from entering the land to stake claims. Even if the landowner refuses to reach agreement, section .130 effectively allows the would-be locator to "force" entry by posting bond satisfactory to the Director of the Division of Lands. Section .130 does not purport to address staking that does not cause physical damage to the land, nor does it address harmless nonintrusive activities, such as airborne aeromagnetic surveys.

The two members of the court who would hold that section .130 does not apply to Hayes's 1982 staking activity do not conclude that such landowners are without remedies. If DNR finds that mining would be incompatible with significant surface uses (perhaps where the surface owner resides on a potential location site), DNR may close the land to mineral location under AS 38.05.185(a) and AS 38.05.300. Such closure would prevent any entry for purpose of mineral location. To the extent staking actually causes damage, the landowner has access to common law remedies. The Alaska Constitution confirms that the State's reservation of access to resources "shall not unnecessarily impair the owner's use, prevent the control of trespass, or preclude compensation for damages." Alaska Const. art. VIII, § 9. There is no absolute privilege to enter to prospect on such lands. A person tortiously causing damage must make the landowner whole. The landowner also has some statutory protection. A trespasser who intentionally cuts trees without consent may be liable for treble damages. AS 09.45.730. Likewise, AS 09.45.735 permits treble damages against one who intentionally trespasses "to gather geo-

try following sale to the landowner would be for the exclusive purpose of staking. The State appears to imply that such situations would be relatively rare. *See Babcock v. O'Lanagan,* 7 Alaska 171, 176 (1924) ("It is undisputed that a subsequent locator can adopt the discoveries of a prior locator.").

**18.** The trial court appears to have assumed that any exploration had occurred while Hayes was the lessee of the landowners. *See A.J. Assocs.,* 846 P.2d at 134.

**19.** *See* 11 AAC 96.140(11), which provides:

entry on all lands under mineral permit, oil and gas exploration license, lease, or claim, by other than the holder of the permit, oil and gas exploration license, lease, or claim, or the holder's authorized representative, shall be made in a manner that will prevent unnecessary or unreasonable interference with the rights of the permittee, licensee, lessee, or claimant.

technical data or take mineral resources...." [20]

In its analysis the superior court compared analogous federal statutes dealing with conveyance of public lands. In our view this analysis is not helpful, largely because we consider Alaska's statutory scheme sufficiently clear that little is gained by referring to dissimilar federal statutes. Thus, comparing the Stock–Raising Homestead Act, 43 U.S.C. § 299 (1988), with the Agricultural Entry Act of 1914, 30 U.S.C. § 121–22 (1988), provides little guidance as to the purpose and scope of AS 38.05.125(a) and .130, or their relationship with AS 38.05.185(a). Also, both federal acts refer to "prospecting," a term not used in subsection .125(a) or section .130. The federal statutes are also more explicit than AS 38.05.125(a). Comparing the two federal acts does not help determine whether AS 38.05.130 applies to staking unaccompanied by exploration or discovery. Further, as the State's amicus brief notes, few cases interpreting the federal surface damage statutes have dealt with similar facts.

The superior court also held that Hayes's failure to satisfy 11 AAC 96.140(10) invalidated his asserted leaseholds. That regulation requires that a locator make good-faith attempts to agree with the surface owner or post bond before conducting "mineral exploratory activity" on land in which the State has reserved a mineral interest. [21] The act of staking, without more, is not "mineral exploratory activity." A locator who stakes without consent, therefore, does not necessarily violate this regulation. There is no claim Hayes conducted unauthorized exploratory activities before he staked in 1982. Therefore, two members of the court are of the opinion that 11 AAC 96.140(10) does not apply.

The landowners argue that Hayes's entry also violated AS 09.45.060, which prohibits a person from entering upon land "except in cases where entry is given by law." [22] If Hayes's 1982 staking entry was not pursuant to rights reserved under AS 38.05.125(a), under what authority did Hayes enter ATS 201? In our view that authority is found in AS 38.05.185, which maintains the availability of "state lands," and thus ATS 201, to mineral location unless withdrawn by the commissioner.

This is consistent with constitutional and legislative expressions of a policy that encourages development of mineral resources. Alaska Const. art. VIII, §§ 11, 12; AS 38.05.185, .195, .205, .300. It is also consis-

---

20. The two members of the court who believe section .130 to be inapplicable here emphasize that a would-be locator of minerals under lands subject to the subsection .125(a) reservation may not enter the surface estate with impunity either to explore for minerals or for the limited purpose of staking. We leave open any question whether an unconsented entry in a given case may be sufficiently inconsistent with existing use of the surface estate that it cannot be deemed a valid exercise of the State's reserved rights. *Cf.* the dissenting opinion of Justice Rabinowitz at 573. Whether the unconsented entry to erect monuments in a homeowner's flower beds falls in such a category remains to be seen. That is not the fact situation here. It will be for the superior court on remand to consider the extent to which this proposition may have any bearing.

Even though the would-be locator can "force" entry to carry out activities subject to section .130, it can only do so in accordance with that statute. The statute presumes that a bond will adequately protect the landowner. If, in a given case, the director determines that no bond could protect the owner, entry would be denied.

The dissenting opinion assumes mining or even exploration could cause a surface owner to suffer substantial damages. Dissent at 573 n.2. The sufficiency of any bond required for Hayes to exercise his rights is in the first instance a matter for the director under section .130. We note that there is no claim that Hayes's mere act of staking caused the landowners any significant damages.

21. 11 AAC 96.140(10) provides:

no person may engage in mineral exploratory activity on land, the surface of which has been granted, licensed, or leased, by the State of Alaska, or on land for which the state has received the reserved interest of the United States until good-faith attempts have been made to agree with the surface owner, licensee, or lessee on settlement for damages which may be caused by such activity. If agreement cannot be reached, or the lease, oil and gas exploration license, or surface owner cannot be found within a reasonable time, operations may be commenced on the land only with specific approval of the director, and after making adequate provision for full payment of any damages which the owner may suffer.

22. AS 09.45.060 provides: "A person may not enter upon any land, tenement, or other real property except in cases where entry is given by law. In those cases the entry may not be made with force but only in a peaceable manner."

tent with long-standing practice in Alaska, and other western states, of encouraging prospecting on public lands. *Rickert v. Thompson*, 8 Alaska 398, 415 (1933), *aff'd*, 72 F.2d 807 (9th Cir.1934). It has long been recognized in the western states that the mineral estate is dominant to the surface estate. *Norken Corp. v. McGahan*, 823 P.2d 622, 628 (Alaska 1991) ("[T]he mineral estate is the dominant estate, carrying with it the right to make such use of the surface as is reasonably necessary to remove the minerals"); John F. Welborn, *New Rights of Surface Owners: Changes in the Dominant/Servient Relationship between the Mineral and Surface Estates*, 40 Rocky Mtn. Min. L. Inst. § 22.02 (1994). Even assuming that rights of surface owners are either dominant or require full compensation when harmed by exercise of rights of access to the reserved mineral estate, the owner of the surface estate cannot altogether deny access to the mineral estate. *Cf. Norken Corp.*, 823 P.2d at 628 n. 5.

### 3. *Effect of failure to comply with AS 38.05.130*

Alaska Statute 38.05.130 contains no explicit remedy for its violation, and says nothing about invalidating a claim staked in violation of the statute.[23] Nor does the regulation specify or imply a remedy of invalidation or ejectment. 11 AAC 96.140(10). Any judicially implied remedy must be consistent with the purpose of the statute. We conclude that it was error to grant the remedy ordered by the superior court, ejectment.[24]

■ As seen above, section .130 protects landowners financially, but does not allow them to completely close their lands to mineral exploration. Consequently, it is enough that landowners be placed in the same position they would have enjoyed had the statute been observed, and an agreement reached or a bond posted. Indemnification, not ejectment, is the appropriate remedy for failing to reach agreement or post a bond. This result sustains the locator's right of entry, and preserves both the locator's incentive to satisfy the requirements of section .130 and the landowner's incentive to act reasonably during negotiations with the locator.[25]

The landowners argue that this court "specifically noted" Hayes's violation of the statute and regulation in *A.J. Associates*, citing to 846 P.2d at 134. The only passage on the cited page that has any potential bearing cannot fairly be read to say that we held that Hayes violated the statute and regulation. That sentence reads: "The court also pointed to Hayes' violation of AS 38.05.130 and 11 AAC 96.140(10) which require posting of a bond to protect the owner of the surface estate prior to mining-related activity." The quoted sentence simply restated the conclusion of the superior court (the "court"), and did not purport to be our holding on that question. Indeed, it was not necessary for us to decide there whether Hayes violated the statute or regulation.

The landowners also argue that the State, in its amicus brief, has agreed that "AS 38.05.130 and 11 AAC 96.140(10) require 'a damage agreement ... or surety bond prior to entry onto the land in order to stake a valid location.'" We do not read the State's amicus brief so broadly. The full sentence that the landowners quote in part reads as follows: "Since AS 38.05.130 and 11 AAC 96.140(10) [require] a damage agreement or surety bond prior to mineral *exploratory* activity, it is consistent to therefore interpret AS 38.05.130 and 11 AAC 96.140(10) as requiring a damage agreement or surety bond prior to entry onto the land in order to stake a valid location." (Emphasis added.) The

---

**23.** When the legislature intends that invalidation of a mining claim be a remedy for failure to comply with statutory requirements, it has specifically so provided. *E.g.*, AS 27.10.140 (placer mining claim location in violation of law is void).

**24.** Because Justice Matthews and the author conclude that Hayes's entry did not violate AS 38.05.130 or 11 AAC 96.140(10), they necessarily also conclude for that reason that the superior court erred in holding that Hayes's unconsented, unbonded entry required his ejectment and invalidated his right to priority in obtaining a lease for either location.

**25.** We need not decide here whether ejectment might be the only effective remedy following a violation of section .130 by a locator who was both unbonded and unable to indemnify the landowner for damage caused by the entry.

State's amicus brief gives examples of mineral exploratory activities that do not involve entry or cause no additional disturbance to the land. "In the preceding examples the mineral exploratory activities are not subject to AS 38.05.130." The State further observes that "the fact that exploration came before staking, does not ipso facto mean that staking requires a bond." In context, the State seems to recognize that normally some mineral exploratory activity precedes a valid location, and that entry for the purpose of staking requires a damage agreement or surety bond because any exploratory activity preceding the staking will normally require an agreement or bond. The State does not seem to assert that staking, without more, falls within section .130.

The landowners also argue that there is no personal "implicit right" to prospect or to mine that "trumps the State's authority to manage these resources as it sees fit." That assertion is correct, but the State's policy in managing these resources is expressed in AS 38.05.185, .195, .250, .300, and article VIII, sections 11 and 12 of the Alaska Constitution. Hayes did not violate this policy when he entered to stake these two claims in 1982.

### 4. *Landowners' alternative arguments for affirmance*

The landowners ask us to affirm the ejectment on two alternative grounds.[26]

■ Rights to mineral deposits in submerged land are not subject to appropriation by prior discovery, location, and recording. AS 38.05.205, .250. Arguing that the property was "submerged land," the landowners assert that Hayes acquired no rights through staking his claims, and is therefore subject to ejectment.

This position is without merit. Even though the land beneath the tailings was once submerged, the property became ordinary real estate long ago. *Alaska Juneau Forest Indus.*, 748 P.2d at 336. Additionally,

the tailings are above mean high tide. *Id.* at 337. The property is not in fact "submerged land." AS 38.05.965(21).[27]

■ The landowners alternatively assert that Hayes failed to comply with the technical requirements of AS 38.05.195 for locating a claim. Such alleged failures do not necessarily invalidate a locator's rights. Alaska Statute 38.05.185(b) explicitly states as much, as long as "it appears to the satisfaction of the commissioner that the mining lessee or the locator complied as nearly as possible under the circumstances of the case, and that no conflicting rights are asserted by any other person." We cannot affirm the summary judgment on the theory Hayes did not fulfill the statutory requirements for locating a mining leasehold.

### 5. *Attorney's fees in the ejectment action*

In 1995 the superior court awarded the landowners $60,000 in Civil Rule 82 attorney's fees. Hayes challenges the award.

■ Fees are awarded to the "prevailing party." Alaska R. Civ. P. 82. A party does not have to prevail on all issues to be a prevailing party. *Day v. Moore,* 771 P.2d 436, 437 (Alaska 1989). The general rule under Civil Rule 82 is that the prevailing party is the party who has successfully prosecuted or defended against the action; it is the one who is successful on the main issue and the judgment entered. *Id.*

■ We held above that it was error to order Hayes's ejectment. The landowners are consequently no longer the prevailing parties in the ejectment action. *See In re Application for Water Rights,* 891 P.2d 981, 984 (Colo.1995) ("In order to be the prevailing party, one must ... achieve some of the benefits sought by the litigation."). Consequently we vacate the fees award and remand for further proceedings.

---

**26.** We can affirm a summary judgment on grounds different than those found by the trial court. *Wright v. State,* 824 P.2d 718, 720 (Alaska 1992).

**27.** We see no reason to rely on the definition of "lands beneath navigable waters," found in the federal Submerged Lands Act, codified at 43 U.S.C. § 1301(a)(3) (1986). That term has no bearing here.

### B. *Hayes v. Jansen Appeal: The Propriety of the Landowners' Summary Judgment*

Hayes filed tort claims against the landowners in 1993, asserting that they interfered with Hayes's rights relating to Taku Nos. 1 through 8. The superior court granted partial summary judgment to the landowners, dismissing all but two of Hayes's tort claims. Hayes appeals from the partial summary judgment.

In reviewing a grant of summary judgment, we must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Thorstenson v. ARCO Alaska, Inc.*, 780 P.2d 371, 374 (Alaska 1989). We draw all reasonable inferences in favor of the non-movant. *Swenson Trucking & Excavating v. Truckweld Equip. Co.*, 604 P.2d 1113, 1116 (Alaska 1980).

#### 1. *Relevant statutes and regulations governing rights accruing to mineral locators*

Alaska Statute 38.05.185 establishes the basic framework for acquisition of rights to mineral interests held by the State. That statute further allows DNR to restrict the acquisition of those rights. *See supra* note 12. DNR thus may either close land to mineral location or restrict state land to mining under lease.

■ A DNR regulation restricts mining on lands in which the State reserved mineral rights after their sale or lease to private parties. When Hayes staked his claims, that regulation read:

This section constitutes the commissioner's finding, in accordance with AS 38.05.185(a), that selling, leasing, or otherwise disposing of any interest in land other than a locatable mineral interest, with the mineral rights reserved to the state, creates potential use conflicts requiring that mining be allowed only under written leases. If the land remains open to location, any location made on that land after the disposal is a leasehold location.

Former 11 AAC 86.135(b) (am.5/18/90).[28] Any location made upon lands conveyed to a private party, with a mineral interest reserved to the State, is thus a "leasehold location."

One who makes a leasehold location, by prior discovery, location, and recording, receives a preference right to a lease. AS 38.05.205; 11 AAC 86.300 (1996). Under 11 AAC 86.305, the holder of such a preference right is required to apply for a lease from DNR in order to begin mining operations. By statute, "[m]inerals may not be mined and marketed or used until a lease is issued, except for limited amounts necessary for sampling or testing." AS 38.05.205. If DNR rejects the lease application, the location is void.[29] 11 AAC 86.305(d) (1996).

#### 2. *Rights conferred by Hayes's locations*

■ Under the regime established by these statutes and regulations, any location made by Hayes on ATS 201 was a leasehold location. ATS 201 was conveyed to a private party. Under 11 AAC 86.135(b) and AS 38.05.185(a), DNR restricted the property to mining under lease only. Hayes's location,

---

**28.** This subsection was amended in 1996 to read: This section constitutes the commissioner's finding, in accordance with AS 38.05.185(a), that selling or leasing of land other than a locatable mineral interest, with the mineral rights reserved to the state, creates potential use conflicts requiring that mining be allowed only under written leases. If the land remains open to location, any location made on that land after such a sale or lease is a leasehold location.
11 AAC 86.135(b) (1996).
Hayes argues briefly that DNR did not make the determination required to restrict mining under AS 38.05.185(a). While a specific finding of incompatibility is required to close land to min-

ing, the statute makes it clear that in order to restrict land to mining under lease, the commissioner need only determine that "potential use conflicts on the state land" so require. 11 AAC 86.135(b) explicitly reflects this determination.

**29.** Hayes argued in the superior court that DNR lacked discretion to deny a lease to the holder of a valid mining location, and that therefore his possession of such a valid location was tantamount to a right to mine. Hayes does not make that argument on appeal, and has therefore waived it. *See Katmailand, Inc. v. Lake & Peninsula Borough*, 904 P.2d 397, 402 n. 7 (Alaska 1995).

therefore, was a leasehold location. As such, it entitled him only to a preference right to a lease; Hayes had no right to conduct mining activities until he applied for and received such a lease from DNR. Hayes raises three major arguments to the contrary; none is convincing. He first argues that 11 AAC 86.135(b) does not apply to his locations. He suggests that by conveying the property to the landholders, the State did not sell, lease, or otherwise dispose of any interest in land, and that 11 AAC 86.135(b) hence did not restrict the property to mining under lease. The record indicates otherwise. The State's patent granted the property, subject to the State's mineral reservation, to the landowners, their heirs and assigns, in exchange for "good and valuable consideration." The property was conveyed by the State to the landowners, and 11 AAC 86.135(b) squarely applies.

■■■ Hayes next asserts that this regulation does not apply to mineral locations; in support he cites the regulation's language limiting its effect to "the selling, leasing, or otherwise disposing of any interest in land other than a locatable mineral interest." 11 AAC 86.135(b) (1985). The quoted language plainly refers to the interest conveyed by the State to the landowners, not the interest claimed by the mineral locator. When the State explicitly conveys a mineral interest to a private party, 11 AAC 86.135(b) does not apply. When the State conveys any other interest in land, the regulation applies. In this case the interest sold by the State to the landowners was not the mineral interest, but was instead a fee interest subject to the State's statutory reservation of mineral rights. Therefore, the regulation applies to ATS 201.[30]

■■■ Finally, Hayes argues that the production license DNR issued to Hayes in 1989 constituted a determination that Hayes was entitled to begin production on the property. Alaska Statute 38.05.207 mandates that "[a]n application for a production license shall be filed with the commissioner when a locator of a mining claim under AS 38.05.195 or a les-

see of a mining location under AS 38.05.205 is prepared to produce minerals for sale in commercial quantities." Hayes correctly points out that the statute requires a production license only for mining lessees and holders of mining claims. Hayes argues that because he was not a lessee when he received the license, DNR must have concluded that he held a mining claim rather than a leasehold location, and is not required to apply for a lease in order to mine.

This does not follow. DNR has promulgated regulations allowing issuance of production licenses to holders of a "mining leasehold location ... who are prepared to initiate or continue production of minerals for sale." 11 AAC 86.700(a). The parties do not contend, nor does the statutory language suggest, that DNR cannot allow leasehold locators to apply for a production license and a lease simultaneously once they are prepared to mine. While AS 38.05.207 does not require holders of a leasehold location to apply for a production permit, neither does it forbid them from doing so.

Under 11 AAC 86.700(a), DNR will accept applications for production licenses from holders of leasehold locations. The requirements for issuance of a production license are set out in 11 AAC 86.700(c); a license will be granted if a "leasehold location has been discovered, located, filed, and maintained in accordance with AS 38.05.185–38.05.280; *or* ... a state mining lease has been issued." 11 AAC 86.700(c)(4)(A) & (B) (emphasis added). DNR need not determine that the holder of a leasehold location is entitled to mine, under lease or otherwise, before it grants a permit. 11 AAC 86.700(c).

Hayes's acquisition of a production license, therefore, is not inconsistent with the conclusion that he holds no more than a leasehold location and was required to apply for and obtain a mining lease before beginning to extract minerals from the property. Indeed, DNR explicitly informed Hayes that the "license authorizes the production of minerals for sale, *subject to other applicable statutes and regulations*." (Emphasis added.)

---

**30.** Hayes also argues that 11 AAC 86.135(b) does not apply to the property because it qualifies as "tide and submerged land." The regulations and the statute contain no language that might make this distinction relevant to the application of the leasing restriction.

We hold that any locations staked by Hayes were leasehold locations entitling him to no more than a preference right to a lease.[31]

### 3. *Claims based upon Hayes's right to mine*

█ The first two counts of Hayes's amended complaint are based upon his alleged right to "enter ... stake claims, develop, drill, mine, occupy and remain on [ATS 201]." Hayes claims that the landowners, both by preventing Hayes's entry on the land and by placing improvements upon the property, have tortiously interfered with these activities. Hayes asserts that he has consequently been prevented from mining and extracting minerals from the property.

As explained above, however, Hayes has only a preference right to a lease. He has no right to mine or extract minerals until he receives a lease. The landowners are accordingly entitled to summary judgment on those counts as a matter of law; absent a right to mine, Hayes cannot claim that the landowners owed him any right to mine. It was appropriate to grant summary judgment regarding these counts.

We partially affirm the superior court's summary judgment with regard to Hayes's request for a declaratory judgment establishing his right "to stake claims, develop, drill, mine, occupy, and remain upon the property." As discussed above in Part III.A, Hayes may have the right to stake leasehold locations on the property; he does not possess any of the remaining rights claimed.

### 4. *Abuse of Process*

█ Hayes also alleges that the landowners tortiously "advised, stirred up and/or continued litigation." The superior court found that "[n]one of the activities that have been described to support the allegations in the complaint are actionable."

Abuse of process consists of two essential elements: ulterior purpose and a "willful act in the use of the process not proper in the regular conduct of the proceeding." *DeNardo v. Michalski*, 811 P.2d 315, 317 (Alaska 1991) (citation omitted). Merely filing a suit, even for an improper purpose, is not sufficient for an abuse of process action. *Id.*

The landowners have acted to preserve their own claims to the surface of the property. Hayes has presented no evidence of an ulterior motive. Nor has he alleged any improper or irregular action taken by the landowners. The court properly granted summary judgment to the landowners.

### 5. *Interference with prospective economic advantage*

The superior court granted summary judgment to the landowners on Hayes's claim of interference with prospective economic advantage.

█ The elements of that tort are: (1) the existence of a prospective business relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship, and intent to prevent its fruition; (3) conduct by the defendant interfering with the relationship; (4) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (5) causation of the plaintiff's damages by the defendant's conduct; and (6) absence of privilege or justification for the defendant's action. *Oaksmith v. Brusich*, 774 P.2d 191, 197–98 (Alaska 1989).

█ The superior court determined that Hayes's alleged damages were not caused by the landowners' conduct. The court found that Hayes unreasonably failed to apply for a mining lease, and that any lost economic opportunity resulted from this failure. This was error. Hayes presented evidence that his lease application was rejected as a result of his dispute with the landowners. DNR

---

**31.** The superior court found there was a genuine issue of material fact whether the landowners consented to the staking of Taku Nos. 3 through 8. It accordingly held that these might be valid locations. It relied upon the ejectment action to hold that Taku Nos. 1 and 2 were invalid. We have held that consent was unnecessary for the 1982 staking entries, and that ejectment would not be the appropriate remedy for Hayes's violation of AS 38.05.130. Assuming Hayes can meet the other requirements for valid location, Taku Nos. 1 through 8 are valid leasehold locations.

explained its refusal to issue Hayes a lease as follows:

> A.J. Industries ... [is] protesting the issuance of a lease to you and assert[s] that your claims conflict with their Alaska Timber # 1–4 claims....
>
> Under authorities granted to me by A.S. 38.05.205 and 11 AAC 86.305(F), this letter constitutes my decision not to adjudicate the conflict between the Taku # 1–4 claims and Alaska Timber # 1–4 claims. The parties are advised to resolve this conflict themselves. As such, your lease application is rejected, a new application may be submitted after resolution of this conflict.

Drawing all inferences in favor of Hayes, this letter creates a genuine issue of material fact as to whether Hayes applied for a lease, and whether any failure to pursue a lease was unreasonable.

■ We nonetheless affirm the superior court's judgment on an alternative ground. "This court is not bound by the reasoning articulated by the trial court and can affirm a grant of summary judgment on alternative grounds." *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992). Hayes submitted evidence of a single prospective business relationship, with an Australian company, based upon his mining locations. A representative of the company affied that in 1989 it and "other investors elected not to go forward because of the pending lawsuit." Therefore, any tortious conduct by the landowners that interfered with that business relationship must have taken place no later than 1989. The applicable limitations period is two years. AS 09.10.070; *see Blake v. Gilbert*, 702 P.2d 631, 639 (Alaska 1985), *overruled on other grounds, Bibo v. Jeffrey's Restaurant*, 770 P.2d 290, 296 n. 9 (Alaska 1989). Hayes did not file his tort action until 1993. His action was consequently time-barred.

### C. *Jansen v. Hayes: The Propriety of Denying Summary Judgment to the Landowners*

The landowners also moved for summary judgment with respect to Hayes's claims that the landowners tortiously destroyed monuments, markers, other items owned by Hayes, and an access road he constructed. The trial court found that genuine issues of material fact required a trial regarding those tort claims. It consequently denied the landowners' motion for summary judgment.

The landowners argue in their cross-appeal that they were entitled to summary judgment on these causes of action. They contend that an independent contractor, Knik Construction, removed Hayes's stakes and monuments and destroyed the access road. Knik Construction is not a party to this case, and the landowners contend that they cannot be held liable for its actions.

■ The general rule is that a principal is not liable for torts committed by an independent contractor. *Sievers v. McClure*, 746 P.2d 885, 889 n. 6 (Alaska 1987); *Restatement (Second) of Torts* § 409 (1965). However, the employer of an independent contractor may be liable for harm caused by acts or omissions committed by the independent contractor pursuant to the employer's orders or instructions. *Moloso v. State*, 693 P.2d 836, 840 n. 3 (Alaska 1985); *Restatement (Second) of Torts* § 410 (1965). Hayes presented evidence sufficient to create a genuine issue of material fact as to whether Knik Construction was acting under Jansen's direction when it destroyed Hayes's property.

Accordingly, we conclude that the trial court did not err in denying summary judgment to the landowners on these tort claims.

### IV. *CONCLUSION*

Four justices have participated in the decision of this case. Three justices agree with Part III.A.1 of this opinion and hold that the state's mineral interest in lands on which the surface estate has been conveyed to a third party is "state land." The court is evenly divided regarding the discussion in Part III.A.2 about whether AS 38.05.130 applies to Hayes's staking activity. The superior court's conclusion that section .130 governs the staking activity is therefore affirmed. Three justices agree with the result reached in Part III.A.3 concerning the effect of failure to comply with AS 38.05.130. Accordingly, the superior court on remand should determine an appropriate amount and means of indemnification pursuant to section .130. The superior court may require the parties

to petition the director of the Division of Mining to determine the sufficiency of a surety bond as to form, amount, and security pursuant to section .130. Three justices agree with Part III.A.4, which rejects the landowners' alternative arguments for affirmance. Three justices agree with Part III.A.5, which vacates the award of attorney's fees in the ejectment action. All justices agree with the result of Part III.B, which affirms partial summary judgment in favor of the landowners as to all but two of Hayes's tort claims. Three justices agree with Part III.C., which affirms the trial court's denial of summary judgment as to the Hayes's tort claims for the destruction of property.

Accordingly, the judgment of the superior court is AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED for further proceedings.

SHORTELL, J. pro tem, concurring in the result.

RABINOWITZ, Justice, joining in Part A of Justice Shortell's concurring opinion.

■■■ Because I disagree with the conclusion that AS 38.05.130 does not cover Hayes's acts establishing the boundaries of his claims, I write separately on that issue. However, I agree with Justice Eastaugh's alternative conclusion that summary ejectment or invalidation of Hayes's claims would be an inappropriate remedy in this case. Thus, although I disagree with one aspect of Justice Eastaugh's opinion, ·I agree that the judgment granting ejectment should be reversed.[1]

A. *Hayes Was Required to Comply with AS 38.05.130 before He Staked His Claims.*

Alaska Statute 38.05.130 provides, in pertinent part:

1. I also agree with Justice Eastaugh's analysis of all issues arising out of Hayes's tort action.

2. I also disagree that Hayes's only act under consideration here is "the limited physical act of staking." Hayes also remained on the landowners' property without consent, established the boundaries of his claim, and then staked it. Apparently, Hayes considers his activity to have been substantial enough to justify a tort claim for damages against the landowners, in the language

Rights may not be exercised by the state, its lessees, successors or assigns under the reservation as set out in AS 38.05.125 until the state, its lessees, successors, or assigns make provision to pay the owner of the land full payment for all damages sustained by the owner, by reason of entering upon the land. If the owner for any cause refuses or neglects to settle the damages, [the mineral claimant] may enter upon the land in the exercise of the reserved rights after posting a surety bond ... sufficient ... to secure to the owner payment for damages....

■■■ Hayes staked his claims without first obtaining the consent of the landowners or posting a bond complying with the requirements of AS 38.05.130. If these acts were in the exercise of "[r]ights ... as set out in AS 38.05.125," Hayes violated the protective requirements of section .130, and he should suffer the consequences of his unlawful acts.

Justice Eastaugh concludes that staking of claims is not the exercise of a right covered by subsection .125(a). The right to explore, in his view, does not include staking. In the absence of a statutory definition of the word "explore," he reads that word not to cover unconsented entry and staking of claims by gold seekers on land owned by private citizens. In his view, "explore" does not "encompass in its common or mining usage the limited and discrete physical act of staking." Maj. op. at·564. I disagree with this interpretation of the statute.[2]

It can hardly be denied that subsection .125(a) was intended by its drafters to be comprehensive in scope. It covers all title transfers of state land to holders of private

of his amended complaint, for destruction of his "claim monuments, stands, markers, foundations, structures, and mountings for the structures incidental to the staking of said mining claims." In characterizing Hayes's acts as "immaculate" staking (Maj. op. at 564), Justice Eastaugh may be suggesting that this is a one-of-a-kind case and therefore limited in its consequences for landowners and mineral claimants. I believe that there are much wider implications to his interpretation of the statutes and regulations at issue here.

interests. AS 38.05.125(a). All mineral, geothermal, and fossil resources are reserved to the state or its successors, who are given the right to explore, enter, develop, and remove the reserved resources. *Id.* It further grants the state or its successors the right to build, use, and maintain all facilities deemed necessary for extraction of the resources sought. *Id.* However, the statute also limits use of the property entered by mineral claimants; that use must be *"reasonably necessary or convenient* to render beneficial and efficient *the complete enjoyment of the property* and the rights hereby expressly reserved." *Id.* (emphasis added).

By such a comprehensive grant of power, the legislature intended to preserve the rights of mineral claimants to extensive and potentially disastrous exploitation of surface landowners' property. Knowing the potential for harm to the surface estate, the legislature was careful to limit uses under subsection .125(a) to those that are "reasonably necessary." By doing so, it attempted to strike a balance between the competing rights of landowners and mineral claimants.

I have no quarrel with the proposition that the reservation of rights in section .125 establishes mineral rights as the "dominant estate" consistent with long-standing mining-law doctrine. *See Norken Corp. v. McGahan,* 823 P.2d 622, 628 (Alaska 1991). However, I believe that our interpretation of section .125 should also recognize another well-established principle that balances the rights of owners of dominant and servient estates

by limiting mineral developers to those uses that are "reasonably necessary." *Id.*[3]

Our interpretation of sections .125 and .130 should take into account these two related principles: (1) that the mineral estate is dominant and (2) that its dominance is subject to the rule of reasonable accommodation. Subsection .125(a) complies with these rules by allowing the owner of reserved mineral rights "all rights and power in, to, and over said land ... reasonably necessary or convenient to render beneficial and efficient the complete enjoyment of the property and rights hereby expressly reserved."

Section .125 covers all aspects of mining from exploration through development. It specifically reserves to the state and its successors the right "to explore," "to enter," "to erect, construct, maintain, and use" all necessary buildings, machinery, and roads, "to remain" on the property for all purposes relating to exercise of the reserved rights, and "to occupy" the property. It also reserves "all rights and power" over the land that are reasonably necessary. The breadth and completeness of the rights reserved and activities authorized demonstrate an intent to cover all activities related to finding, developing, and working mineral properties. There is little reason to conclude that staking should be excluded from its protective scope.

By exempting from the reach of the statute an essential step on the path from exploration to development, Justice Eastaugh's opinion is at odds with legislative intent as manifested in the statutory language.[4] I

---

**3.** In *Norken* we recognized that the rights of the mineral estate " 'are to be exercised with due regard for the rights of the owner of the servient estate.' " *Norken,* 823 P.2d at 628 (quoting *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex. 1971)). The purpose of the doctrine of reasonable use is to effect an "accommodation" between the surface and the mineral estates. *Id.; see also Spurlock v. Santa Fe Pac. R.R.,* 143 Ariz. 469, 694 P.2d 299, 309 (App.1984) ("We recognize that in order for both the surface and mineral estates to co-exist and retain their individual value, some accommodation between the respective owners is necessary."); *Hunt Oil Co. v. Kerbaugh,* 283 N.W.2d 131, 135–36 (N.D.1979); *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex. 1971); *Flying Diamond Corp. v. Rust,* 551 P.2d 509, 511 (Utah 1976). Accommodation is necessary for more than just economic reasons. As one commentator has said: " 'All too often ...

the ever-present shotgun in the hands of the surface occupant becomes the center of attention. That shotgun is still there today, and the value of cooperation and of being a good citizen is as important as it ever was.' " John F. Welborn, *New Rights of Surface Owners: Changes in the Dominant/Servient Relationship Between the Mineral and Surface Estates,* 40 Rocky Mtn. Min. L. Inst. § 22.01 (1994) (quoting John C. Lacy, *Conflicting Surface Interests: Shotgun Diplomacy Revisited,* 22 Rocky Mtn. Min. L.Rev. 731, 733 (1976)). AS 38.05.130 codifies this necessary accommodation between landowner and mineral claimant.

**4.** Mining laws are construed liberally for the benefit of a *bona fide* locator. *See Rickert v. Thompson,* 8 Alaska 398, 415 (1933), *aff'd,* 72 F.2d 807 (9th Cir.1934). This rule of interpreta-

cannot agree that absence of the word "staking" from section .125, the language of that section in its entirety, or dictionary or mining-text discussions of the word "explore"[5] reasonably lead to the conclusion that "staking" is an isolated mining activity not covered by the statute.

In fact, the description of "mineral exploration" given in an authoritative mining-law text indicates that staking should be included within the scope of sections .125 and .130. According to *American Law of Mining:*

> Exploration typically involves a succession of steps ... in which the explorationist seeks first to locate and then to recognize or "prove up" a discovery of a minable deposit....

*American Law of Mining* § 1.03[1], at 1–41 (Rocky Mtn. Min. L. Found. ed., 1994).

Hayes could neither "locate" nor "prove up" his claim without staking. Location, to be valid, requires both discovery[6] and the marking of boundaries and posting of location notice (staking). *See* 11 Alaska Administrative Code (AAC) 86.135(a); 11 AAC 86.205; 11 AAC 86.210. Therefore, when Hayes entered or remained on the property and staked his claim, he was taking one of the "succession of steps" by which he sought, in the words of *American Law of Mining,* "first to locate and then to recognize or 'prove up' a discovery of a minable deposit."

Recognizing staking to be one of the essential steps of mineral exploration is fully consistent with common or mining usage, with article VIII, section 11 of the Alaska Constitution, and with Alaska statutes governing the rights and duties of landowners and appropriators of state-reserved mineral interests. Thus, I conclude that staking should

be included in the rights reserved by AS 38.05.125(a). This right may not be exercised by Hayes until he makes provision to pay the landowners full payment for all damages sustained by reason of Hayes's entry onto their land, or until he posts a surety bond sufficient to protect the landowners' interests. AS 38.05.130. Hayes violated section .130 when he remained on the property and staked without first obtaining the landowners' consent or the requisite bond.[7]

### B. By Violating Section .130, Hayes Did Not Necessarily Forfeit His Right to Develop His Claim.

Justice Eastaugh concludes that even if Hayes violated subsection .125(a) the remedy of ejectment or invalidation of his claim would not be appropriate. As he says:

> [S]ection .130 protects landowners financially, but does not allow them to completely close their lands to mineral exploration. Consequently, it is enough that landowners be placed in the same position they would have enjoyed had the statute been observed, and an agreement reached or a bond posted. Indemnification, not ejectment, is the appropriate remedy for failing to reach agreement or post a bond. This result sustains the locator's right of entry, and preserves both the locator's incentive to satisfy the requirements of section .130 and the landowner's incentive to act reasonably during negotiations with the locator.

Maj. op. at 567.

I agree with this analysis as it applies to the facts of this case. The next logical step, therefore, should be a remand for further proceedings to determine how to indemnify

---

tion is not violated if the statute is interpreted, as it should be, to balance the rights of competing interests while preserving the mineral estate's dominant status.

5. The definitions of "explore" in *Webster's International Dictionary* and *Black's Law Dictionary* quoted in Justice Eastaugh's opinion are too general to be helpful. Maj. op. at 564. Neither of these definitions provides any substantial support for the opinion's ultimate conclusion.

6. Hayes claims he discovered his claims before he staked them, at a time when he was validly on

the property as a lessee. However, discovery does not necessarily terminate the process of exploration. *See Converse v. Udall,* 399 F.2d 616, 620–21 (9th Cir.1968) (indicating that some further exploration may occur after discovery). And, if discovery were to terminate the exploration process, staking should be considered to be development, which is also covered by AS 38.05.125.

7. Hayes also violated 11 AAC 96.140(10), as the trial court correctly decided.

the landowner for damage that has occurred from Hayes's acts or any reasonably foreseeable damage that might occur from re-entry on the property and re-staking of the Hayes claims.

I would, therefore, affirm the trial court's decision finding that Hayes violated the provisions of AS 38.05.130. However, I would reverse its summary decision to invalidate all of Hayes's rights to pursue his mining claims. I would remand for further proceedings to determine the consequences of Hayes's violation of AS 38.05.130 and for any other proceedings that are consistent with the principles set out in these opinions. I therefore concur in all aspects of Justice Eastaugh's opinion except Part III.A.2.

RABINOWITZ, Justice, dissenting.

The court's opinion opens up all privately-held land in Alaska that was once owned by the state to forced-entry staking-and-location mining. It denies landowners the right to bar unauthorized entry onto their land and it eviscerates the protections afforded by the mining code's bonding requirements. I dissent.

The primary fault in the court's opinion is its assumption that the legislature has authorized claim staking of the state's reserved mineral interests on privately-owned lands. Pursuant to the Statehood Act and AS 38.05.125, the state reserves mineral rights in itself whenever it conveys land to a private party. In 1981, the legislature amended AS 38.05.185 to make staking the presumptive means of acquiring the state's mineral interests on "state land." The court concludes that because the state retains the mineral rights when it sells land to a private party, such land remains "state land" for purposes of the staking authorization provided for in AS 38.05.185. Maj. op. at 562–563. Even land where a private party has built a home or business is open to forced-entry mining under the court's construction of Alaska's mining code. I reject this approach. Legislative history, the mining code, and this court's precedent amply demonstrate that land that has been transferred to a private party is not "state land" for purposes of section .185's authorization of claim staking.

Alaska Statute 38.05.185(a) states in relevant part:

State land may not be closed to mining or mineral location except as provided in AS 38.05.300 and unless the commissioner makes a finding that mining would be incompatible with significant surface uses on the state land. State land may not be restricted to mining under lease unless the commissioner determines that potential use conflicts on the state land require that mining be allowed only under written leases....

The court concludes that this text authorizes Hayes to stake mining claims on A.J. Associates' property. Maj. op. at 562–563, 566–567. I agree that section .185 authorizes claim staking, but not on private lands.

The legislative history behind section .185's staking provision indicates that it was only intended to apply to state-held surface lands. The statutory language quoted in the previous paragraph was added to the mining code in 1981 as a result of a controversy generated earlier that year by an Attorney General's opinion. See infra pp. 50–51. The Attorney General determined that section 6(i) of the Statehood Act requires that mineral deposits in state mineral lands be mined only under written leases. See 1981 Formal Op. Att'y Gen. 113, at 117 (hereinafter 1981 AG's Opinion). In other words, the lease requirement applies to all lands known to have minerals at the time they were granted to the state by the federal government. See Trustees for Alaska v. State, 736 P.2d 324, 340–42 (Alaska 1987).

Prior to 1981, the state understood the leasing requirement as only applying to lands which the state had subsequently transferred to others. It did not contemplate that a lease was required to mine on state lands. The standard view was summed up by Commissioner Phil Holdsworth, the first commissioner of the Department of Natural Resources. He believed that under section 6(i), "the usual mining rights contingent upon discovery and appropriation [i.e., staking] will apply on State public domain lands...." However, "[m]ineral deposits which have been reserved to the State in the conveyance

of lands [in accordance with AS 38.05.125] 'shall be subject to lease by the State as the State legislature may direct.'" Phil R. Holdsworth, Presentation to the Fourth Annual Mining, Mineral, and Petroleum Conference, Anchorage, Alaska, April 4, 1959 (quoting in part to section 6(i) of the Statehood Act of 1958, Pub.L. No. 85–508, 72 Stat. 339), *quoted in* 1981 AG's Opinion, *supra*, at 154–55. In other words, it was believed that staking was allowed on all surface lands owned by the state. But to mine the state's reserved rights in lands which had been conveyed to private parties, the miner would first have to acquire a lease, "as the State legislature may direct." *Id.*

The 1981 Attorney General's Opinion unsettled this understanding by construing the lease requirements as also applying to lands whose surface was owned by the state. As a consequence, the validity of mining claims that had been staked on state lands was thrown into question. Miners protested this change in the law and sought relief from the legislature. David Heatwole, the President of the Alaska Miner's Association, warned miners of the threat to their claims posed by the extension of the leasing requirement. In a letter to the membership, he argued that the section 6(i) leasing requirement "applies only to land on which surface rights have been sold by the state." He noted that application of a leasing system to state lands would mean "loss of rights to acquire mineral rights by discovery and location" and "loss of rights to self initiate a mining investment." David Heatwole, Letter to Membership of Alaska Miner's Association, available in Legislative Research Agency, Response to Representative Charles Anderson's Mineral Leasing Research Request # 81–39, Feb. 28, 1981.

The section .185 staking provision was added to the mining code in direct response to this controversy. The legislature sought to restore the status quo as it had existed prior to 1981. In the hearings before the House Resources Committee on the seminal bill (House Bill 350, 12th Leg., 1st Sess. (1981)), Representative Rick Halford, the bill's prime sponsor, testified that it was intended to allow miners to continue mining despite the new requirements imposed by the Attorney General's Opinion. *See* Hearing on H.B. 350 Before the House Resources Comm., 12th Alaska Leg., 1st Sess., Tape 17 side B No. 1671 (April 30, 1981) (statement of Rep. Rick Halford). Bob Maynard, the Assistant Attorney General who authored the 1981 Attorney General's Opinion, testified that the purpose of the bill was to alleviate problems that were created for miners by the opinion. *Id.* at No. 1572. In other words, the staking provision was intended to allow staking-and-location mining to continue where it had previously been authorized, on state-owned surface lands. To this end, the legislature amended section .185 to permit staking on "state land."

The court relies on the definition section of the mining code to conclude that "state land" includes privately-owned surface lands if the state has retained the mineral rights. Maj op. at 562–563. I do not believe the cryptic reference to "resources" in AS 38.05.965(19) is sufficient to impose the regulatory regime intended for state-held surface land onto privately-held lands. The word "land" is commonly understood to mean the surface, not the minerals buried underneath it. The legislative history of section .185 leaves no doubt that when the legislature authorized staking on all "state land," it had this common definition in mind, not the counterintuitive definition embraced by the court. The staking provision of section .185 relied on by the court was intended only to alleviate the problems created by the 1981 Attorney General's Opinion. The legislature sought to allow staking to continue where it had previously been permitted, on state-owned surface lands.

The notion that the word "land" as used in the code means surface land is consistent with the decision of this court in *State v. Weidner*, 684 P.2d 103 (Alaska 1984). There we had occasion to interpret AS 38.05.300, which prohibits the closure of parcels of "state land" larger than 640 acres to multiple purpose use. Section .300 is part of Chapter 5 of Title 38, and thus falls within the sweep of the statutory definition of "state land" relied on by the court in the instant case. In *Weidner*, a unanimous court determined that

"state land" refers only to *"retained* state land." *Id.* at 111 (emphasis in original). Whenever the state sells surface land, the mineral interest remains in the state pursuant to AS 38.05.125. In *Weidner,* however, the classification of state surface land for disposal, without any conveyance of the mineral estate, was adequate to terminate the status of the land as "state land." The *Weidner* court had no difficulty concluding that when the surface estate is sold, "the land ceases to be state land." *Id.* at 112.[1]

Pursuant to AS 38.05.125, the state reserves the mineral interest whenever it conveys land to another party. Under the court's interpretation of the mining code, any lands which have ever passed through state ownership are open to third-party staking-and-location mining. It does not matter that the land is now the site of a private home or business or is put to some other private use. Anyone who has the inclination to do so may now enter onto private property and set up monuments and markers and establish a mining claim. If a homeowner's lot has previously been owned by the state, the homeowner will have no power to prevent a miner from setting up his monuments and markers in her front yard.

Alaska Statute 38.05.130 at least requires a miner to post a damage bond before engaging in forced-entry mining on a private party's property. The court's opinion acknowledges this requirement only to eviscerate it.

The court holds that even if a miner fails to post a bond, he cannot be ejected from the property. Op. at 567–568. Instead, the court holds that the landowner may only seek post-hoc indemnification. This ruling renders a nullity the assurance of payment afforded by the bonding requirement. The code specifically provides that "[mining] rights may not be exercised . . . until" a bond is posted. AS 38.05.130. If the miner can begin digging or drilling without posting a bond, the private landowner is left completely unprotected in the event that the miner turns out to be judgment proof, or if the damages exceed the miner's resources.[2]

One cannot overemphasize the deleterious consequences of the court's opinion. Any real property that was once in state ownership is now subject to staking-and-location mining. A miner can now stake claims, by erecting stone or post monuments, in the front yard of a private homeowner and dig up the owner's flower beds in pursuit of minerals. Land that has been purchased by a conservation group and set aside for environmental preservation can be mined. A private business can be forced to stay its use of its own land in order to accommodate mining. There is nothing that a private landowner can do to stop forced-entry mining of his property. Given that the right to exclude is a fundamental component of property rights, and the high value Alaskans

---

1. The mining code itself reflects the legislature's understanding that "land" denotes the surface, not the minerals. For example, AS 38.05.130 regulates the exercise of the state's reserved mineral rights on private land. The minerals in question in that statute are owned by the state. Nevertheless, where section .130 refers to the private owner of the surface estate, it describes him as "the owner of the land." *See* AS 38.05.130, lines 3–4. The ownership of the surface and mineral estates is clearly separated, and the statute distinctly refers to the surface estate as "the land."

2. This concern is not merely hypothetical. In this case, several of A.J. Associates' commercial ventures are threatened by Hayes's activities. The company has already spent $100,000 on preliminary engineering for a joint venture with Arrowhead Transfer and Alaska Marine Lines; it has negotiated and signed a $565,000 bond with the city of Juneau, committing itself to add additional infrastructure to the property; and a third party has purchased part of the land and entered into a $1.2 million contract to build a boat terminal on it. As A.J. Associates has noted in a letter to DNR:

> To stop our plans now to accommodate mining will be extremely difficult. . . . Taku smokery will be damaged due to our inability to vacate our facility. Our construction mobilization expenses for Knik are committed. Arrowhead will be committed to a builder. Our cost of capital will be tied up.

The letter concludes by noting that if Hayes is to compensate A.J. Associates for all costs that would result from a stay of its operations, he will have to post "a bond in excess of $10,000,000." It is fairly apparent from the record that Hayes could not produce such a sum. By dispensing with the bonding requirement, the court's opinion virtually guarantees that A.J. Associates will suffer substantial damages that it will never be reimbursed for if it is forced to accommodate mining on its property.

place on the rights of quiet enjoyment and privacy, I believe that legislative review of the provisions of Alaska's mining code in light of the court's opinion is essential.[3]

---

3. Alternatively, I wish to express my agreement with the superior court's conclusion that "exploration," as used in section .125(a), includes staking. The focus of my disagreement with the court's construction is with its conclusion that staking does not fall within the rights reserved under section .125(a) and therefore is not an activity encompassed within the protective provisions of section .130.

As a matter of statutory interpretation, I conclude that the comprehensive reservation provisions of section .125(a) (particulary the right at any time to enter upon the surface estate of private lands for the purpose of exploring and opening the state's reserved minerals estate) encompass staking activities. The court's opinion implicitly recognizes this view in its adoption of the definition of staking found in the *American Law of Mining* where it is stated:

 Exploration typically involves a succession of steps, involving the application of both induc-

tive and deductive concepts, in which the explorationist seeks to locate and then....
*American Law of Mining* § 1.03[1], at 1–41 (Rocky Mtn. Min. L. Found. ed., 1994).

It follows that the protections provided for in section .130 apply to staking activities exercised under the rights granted pursuant to section .125(a) (for a right reserved under section .125(a) may not be exercised until the indemnification provisions of section .130 are satisfied). Additionally, the staking of a private landowner's surface estate without making a good faith effort to reach an indemnification agreement constitutes a violation of 11 AAC 96.140(10).

Lastly, I disagree with the court's observation that the superior court inappropriately fashioned an ejectment remedy for Hayes's violations of section .130 and 11 AAC 96.140(10). In my view the superior court's remedy was appropriate given the rights accorded the surface estate owners under section .130 and 11 AAC 96.140(10).